

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-6-2007

# Andreoli v. Rumsfeld

Precedential or Non-Precedential: Precedential

Docket No. 05-5417

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Andreoli v. Rumsfeld" (2007). *2007 Decisions.* Paper 1170.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1170

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 05-5417

_____

JANICE ANDREOLI,
Appellant

v.

*ROBERT M. GATES, SECRETARY OF DEFENSE;
KEITH LIPPERT, VICE ADMIRAL, SC, USN,
DIRECTOR OF THE DEFENSE LOGISTICS AGENCY
OFFICE OF THE DIRECTOR DLA-D HEADQUARTERS,
DEFENSE LOGISTICS AGENCY

*(Amended pursuant to F.R.A.P. 43(c))

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 03-cv-06682)
District Judge: Honorable Thomas N. O'Neill

_____

Argued January 8, 2007

Before:  SLOVITER and RENDELL, <u>Circuit</u> <u>Judges</u>,
and IRENAS**, <u>District</u> <u>Judge</u>.

(Filed: April 6, 2007)

—————

Mary Ann Hagan     **[ARGUED]**
1700 Sansom Street
Philadelphia, PA  19103
  *Counsel for Appellant*

Kathleen Meriwether     **[ARGUED]**
Office of U.S.  Attorney
615 Chestnut Street
Philadelphia, PA  19106
  *Counsel for Appellees*

—————

OPINION OF THE COURT

—————

RENDELL, *Circuit Judge*.

Janice Andreoli appeals the order of the District Court granting summary judgment in favor of her employer on her Title VII claims for hostile work environment and retaliation,

———

** Honorable Joseph E. Irenas, Senior District Judge for the District of New Jersey, sitting by designation.

2

and on her Rehabilitation Act claim for failure to provide reasonable accommodation. Andreoli proffered evidence of sexually harassing behavior toward her by her coworker, Larry DeLutiis, while she was employed by the Department of Defense at the Defense Supply Center in Philadelphia ("DSCP"). The District Court held that, even if she proved the other elements necessary for a hostile work environment claim, her employer could not be held liable because management took prompt and adequate remedial action upon learning of DeLutiis' conduct, thus availing itself of the defense approved by the Supreme Court in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). We conclude that in doing so, the District Court resolved issues of disputed fact that should have been submitted to a jury.

Andreoli also contended that her employer retaliated against her after she engaged in employment activities protected by Title VII, including speaking with the Equal Employment Opportunity ("EEO") office at the DSCP. Andreoli further asserted that the continuing abuse she endured at her workplace rendered her disabled and that the DSCP failed to provide her with a reasonable accommodation. We conclude that the District Court properly granted summary judgment in favor of her employer on both of these claims because Andreoli did not proffer sufficient evidence to support a finding that her employer's alleged adverse actions were causally connected to her protected employment activity under Title VII, or that she is disabled within the meaning of the Rehabilitation Act. We will therefore affirm in part, reverse in part, and remand for further proceedings on Andreoli's hostile work environment claim.

3

## I.

The District Court granted summary judgment in favor of defendants[1] on Andreoli's hostile work environment claim based on the conclusion that, under the applicable law, Andreoli's employer could not be held liable for DeLutiis' conduct. Although this ruling was essentially fact-based, we think it helpful to discuss the elements of a hostile work environment claim before delving into the lengthy factual underpinnings of this case.

In order to state a claim under Title VII for discrimination resulting from a hostile work environment, an employee must show that "(1) the employee suffered intentional discrimination because of [her] sex, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected the [employee], (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of *respondeat superior* liability." *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001). Here the District Court focused on the last factor, and only that factor, and we will do so as well.

An employer will be liable for the harassing conduct of the alleged victim's coworker if the employer was "negligent or

---

[1]Andreoli sued Keith Lippert and Donald Rumsfeld in their official capacities, as the Director of the Defense Logistics Agency and the Secretary of the Department of Defense. App. at 37.

reckless in failing to train, discipline, fire or take remedial action upon notice of harassment." *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 26 (3d Cir. 1997) (citing *Bouton v. BMW of N. Am., Inc.*, 29 F.3d 103, 106 (3d Cir. 1994)). An employer is negligent if it "knew or should have known about the harassment, but failed to take prompt and adequate remedial action." *Jensen v. Potter,* 435 F.3d 444, 453 (3d Cir. 2006) (internal quotations omitted). Even if the remedial action does not stop the alleged harassment,[2] it is "adequate" if it is "reasonably calculated" to end the harassment. *Id.* (quoting *Knabe v. Boury Corp.*, 114 F.3d 407, 412-13 (3d Cir. 1997)).

In most cases, the focus will be on the timing and nature of the employer's response. We have found an employer's actions to be adequate, as a matter of law, where management undertook an investigation of the employee's complaint within a day after being notified of the harassment, spoke to the alleged harasser about the allegations and the company's sexual harassment policy, and warned the harasser that the company does not tolerate any sexual comments or actions. *See Knabe v. Boury Corp.*, 114 F.3d 407 (3d Cir. 1997). On the other hand, we have denied summary judgment in favor of an employer when there was a nineteen-month delay between when the

---

[2] A remedial action that stops the harassment is adequate as a matter of law. *Knabe v. Boury Corp.*, 114 F.3d 407, 411 n.8 (3d Cir. 1997); *see also Jensen*, 435 F.3d at 453 (employer action was "adequate" because it stopped the harassment); *Weston*, 251 F.3d at 427 (no liability where employer action stopped the harassment).

5

employer was notified of the complaint and when the employer took remedial action. *Jensen*, 435 F.3d at 453. We have also denied summary judgment in favor of an employer when there was evidence that the employee's supervisor knew about the harassment and did nothing for three months, despite other evidence that the alleged harasser's supervisor later took immediate action upon learning of the harassment. *Bonenberger*, 132 F.3d at 26. We reasoned that a jury should decide whether the employer's remedial action was prompt and adequate.

Here, the District Court decided that the remedial actions taken by Andreoli's employer were prompt and adequate, as a matter of law. We will now review the factual background of Andreoli's claims in some detail in order to explain more fully our grounds for concluding that there is a triable issue of material fact regarding the adequacy and promptness of Andreoli's employer's remedial actions. We will then discuss our rationale for affirming as to the other two claims.

## II.

Most of the underlying facts are undisputed. Where there is a dispute, we view the facts in the light most favorable to Andreoli. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 267 (3d Cir. 2001).

Andreoli worked as a federal employee at the DSCP from 1988 until 2000, when she stopped coming to work because she was suffering from Post-Traumatic Stress Disorder and depression in reaction to the behavior of her coworker, Larry

6

DeLutiis. It all started in 1989, when DeLutiis began making offensive, off-color comments to Andreoli about women from work or women that he had seen outside of work. His comments and actions were, at best, objectionable and, at worst, lewd and harassing.[3]

When this conduct first began, Andreoli told DeLutiis repeatedly that his comments were unwelcome and also complained to her supervisors at the DSCP. There is no evidence that the supervisors to whom Andreoli complained, including her assistant shift supervisor and her shift supervisor, Theodore DeSanto, took any action to prevent or remedy the ongoing harassment. In response to Andreoli's complaints, the first line supervisor on her shift told her not to bother him "with this shit." App. at 597. Nothing was done after Andreoli, visibly shaking and crying, told DeSanto that DeLutiis had pushed his hand between her legs and refused to remove it.

---

[3]DeLutiis described a woman that Andreoli knew from high school as having "big jugs" and described what he would like to do with the woman's breasts. He also made reference to fondling female coworkers and commented on Andreoli's clothes and appearance, including her buttocks and her chest. He made comments about what he would do to Andreoli if he ever had the opportunity and repeatedly mentioned that his nickname was "the lapper." App. at 595-96. He leaned very close to Andreoli and brushed against her and tried to kiss her. At one point, DeLutiis put his hand between Andreoli's legs and refused to remove it until Andreoli began screaming and dug her fingernails into DeLutiis' arm.

DeSanto ignored Andreoli's distress, and joined DeLutiis in laughing at the suggestion that Andreoli had pushed DeLutiis' hand between her legs and told him to "feel her or finger her." App. at 597. Andreoli complained and made specific requests for a shift change, but the supervisor in charge of all three shifts of workers at the DSCP failed to act, and tried to avoid discussing the matter with Andreoli.

There was one exception to this pattern of supervisory inaction: Division Chief Robert Olewnik. After failing to elicit any response from the four supervisors to whom she complained, Andreoli sought out Olewnik and told him of the escalating, pervasive, hostile, sexually harassing situation with DeLutiis. Olewnik was not surprised. He assured Andreoli that he would take care of it. App. at 600. However, despite these assurances, nothing happened, and Andreoli sought his help a few more times. Several months after Andreoli first complained, Olewnik transferred DeLutiis to a different shift. He also refused to promote DeLutiis to a supervisory position at the DSCP, in part because Andreoli had told him that DeLutiis had put his "hand under her dress." App. at 565. DeLutiis retaliated against Olewnik by filing a reverse discrimination charge against the DSCP. Andreoli provided an affidavit describing DeLutiis' harassment to Olewnik for use in defending against DeLutiis' discrimination complaint, which DeLutiis eventually withdrew. Olewnik left the DSCP in July 1995.

DeLutiis did not change his ways after he was transferred to a different shift. In 1996, DeLutiis again began making derogatory comments about women in Andreoli's presence,

referring to his nickname and making remarks about how women should not be in positions to make any decisions. DeLutiis would linger around the office after his shift was over and Andreoli had begun work on her shift, hanging around the sign-in sheet or sitting in the print room or the break room. DeLutiis also commented that he was going to switch to the second shift, Andreoli's shift.

Andreoli spoke to her immediate supervisor, Robert Crawford, about what she had been through with DeLutiis. Crawford replied, "Well, Janice, that was a long time ago. You need to get over that." App. at 607. She then spoke to Provision Chief Rosemarie Badame. Andreoli, visibly shaken up and crying, told Badame that DeLutiis was trying to get on her shift, that he stalked her and sexually harassed her, and that the harassment was ongoing. App. at 607. Badame replied that Andreoli was not the first person to complain about DeLutiis' behavior, but that if Andreoli were to tell anyone about the harassment, DeLutiis would find out. Then, there would be nothing Badame could do to "save" Andreoli because DeLutiis has a pattern of harassing people. App. at 607. In 1997, Andreoli applied for a position as an IT Specialist and was transferred to DeLutiis' shift.[4]

_____

[4]There is nothing in the record as to why Andreoli applied for and accepted a job that required her to work on the same shift as DeLutiis. However, she submits in her reply brief that she applied for this position because, as a result of restructuring at the Department of Defense, "all the employees in her section were told that they must apply for jobs remaining at the facility"

9

In February of 1999, while Andreoli was pursuing a work-sponsored fellowship at Drexel University, she contacted her employer's EEO office about filing a complaint, and did file a formal complaint in March, 2000. In the interim, she completed the Drexel fellowship and returned to full-time work at the DSCP. The DSCP was in a new location, and Andreoli was assigned a workspace in an alcove in the building, where the copy machine had previously been housed and the water cooler was located. DeLutiis took advantage of Andreoli's new workspace location to stoop down and brush his leg against her while he was getting a drink. The water cooler was eventually moved, after Andreoli made several requests.

DeLutiis' bad behavior continued. It escalated in April 2000, when he began to physically threaten Andreoli while driving his government vehicle in the DSCP parking area. On the first occasion, Andreoli was sitting on a cement post outside one of the DSCP buildings and DeLutiis drove a government van very close to Andreoli and parked in a no-parking area next to where she was seated. Twice later that month, DeLutiis was again driving a government van and swerved towards Andreoli as though to run her over as she was crossing the parking lot. Andreoli did not originally report these incidents to DSCP management, out of concern that her supervisors had begun to view her as a constant complainer, until DeLutiis drove head-on toward her on May 22, 2000.

Andreoli went immediately to the office of her second

---

or risk being out of a job. Appellant's Reply Br. at 6.

line supervisor, Dudley Bolbat, but was unable to get a meeting with him that day. The next morning, Andreoli informed him about the ongoing harassment by DeLutiis and DeLutiis' threatening behavior, including the car incident. In response, Bolbat asked Andreoli if she minded if he discussed the matter with his wife and got back to her. App. at 622. A day or two later, Bolbat told Andreoli that DeLutiis had been instructed to beep his horn if Andreoli was in his way in the future. Not surprisingly, this instruction was ineffective in putting a stop to DeLutiis' behavior. About a month later, DeLutiis again drove a government van through the parking lot towards Andreoli, who was standing with her sister near the DSCP building door. Andreoli heard a screeching of tires coming towards her and her sister, and both women lost their footing. DeLutiis parked the van in the no-parking area next to where Andreoli and her sister were seated and walked into the building. Contrary to Bolbat's alleged instructions, DeLutiis did not beep his horn.

Andreoli reported this incident to Bolbat and to the detectives at the DSCP. In response, a traffic hearing was held almost two months later, focusing on the general safety of DeLutiis' driving, rather than his intent to threaten and harass Andreoli. The hearing officer did not allow Andreoli to discuss prior incidents of harassment, and ultimately ruled in DeLutiis' favor. Although a DSCP detective was initially eager to pursue the matter further and investigate Andreoli's allegations, his attitude changed dramatically during the time that Andreoli was away from work on vacation. When Andreoli called him after she had returned from her vacation to discuss the investigation, he told her that he could not speak with her and cut short their phone conversation. App. at 624. The detective's sudden lack

11

of interest in investigating DeLutiis' behavior greatly upset Andreoli and she was unable to report to work on the following day, or for the rest of the week. She then sought psychiatric help in July of 2000 and took a medical leave of absence from the DSCP. At this time, Andreoli was diagnosed as suffering from depression and panic disorder.

In December of 2000, Andreoli wrote to her DSCP supervisor to request that the DSCP accommodate her disability by allowing her to work from 8 p.m. until 4 a.m., so that she could work without being in contact with DeLutiis. In April 2001, the DSCP denied this request and asked Andreoli to submit medical documentation to help the DSCP identify possible accommodations for Andreoli. Andreoli's counsel replied that Andreoli would be able to work anywhere other than on the same physical site as DeLutiis. In June 2001, DSCP notified Andreoli's counsel that a suitable assignment for Andreoli could not be identified.

It is undisputed that DeLutiis was never interviewed by the agency EEO office about the formal complaint Andreoli filed in March 2000, nor did DeLutiis at any time receive training about sexual harassment from the DSCP. No supervisor or manager at the DSCP ever spoke to, disciplined, or counseled DeLutiis about his behavior towards Andreoli. App. at 127. The only guidance given to DeLutiis by the DSCP was in the form of a memo instructing him to stay away from Andreoli, which he received in August of 2000, after Andreoli had already taken leave from the DSCP. App. at 669.

12

Andreoli filed a complaint against her employer in federal court in December, 2003, asserting claims under Title VII for hostile work environment and retaliation and under the Rehabilitation Act for failure to provide reasonable accommodation. The District Court granted summary judgment in favor of defendants on all claims. This appeal followed.

## III.

We exercise plenary review over the District Court's grant of summary judgment in favor of Andreoli's employer, and we apply the same standard that the District Court should have applied. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 276 (3d Cir. 2001).[5] Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000).

### A. Hostile Work Environment

The District Court concluded that Andreoli could not succeed because her employer established, as a matter of law,

_____

[5]The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343. We have jurisdiction over Andreoli's appeal pursuant to 28 U.S.C. § 1291.

that it took prompt and adequate remedial action to terminate the harassment and prevent further incidents. The District Court evaluated the promptness and adequacy of management's remedial actions as follows:

> Defendants argue that after learning of each incident of DeLutiis' objectionable behavior, management employees at the DSCP took prompt and adequate remedial action to terminate the harassment and prevent further incidents. I agree. Defendants acted almost immediately after learning of the alleged harassment in an attempt to remedy DeLutiis' objectionable behavior and prevent any further harassment.

App at. 21. The Court also took into consideration the fact that Andreoli "affirmatively place[d] herself in a position of close contact with her alleged harasser" by applying for a job that required her to work the same shift as DeLutiis. App. at 23. We have two problems with this analysis.

First, the District Court placed the burden on Andreoli's employer to establish that it was not vicariously liable for DeLutiis' conduct by proving that it took prompt and adequate remedial action and that Andreoli failed to take advantage of the preventive opportunities offered to her. *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (holding that employer has affirmative defense to vicarious liability for supervisor's conduct if (1) employer acted promptly and reasonably to prevent and correct the alleged harassment and (2) employee unreasonably failed to take advantage of preventive

14

opportunities offered to her). In this case, however, because DeLutiis was not Andreoli's supervisor, there is no presumption of employer liability or accompanying burden on the employer to establish an affirmative defense to liability. As we have previously recognized, "[u]nder Title VII, much turns on whether the harassers are supervisors or coworkers. If supervisors create the hostile environment, the employer is strictly liable, though an affirmative defense may be available where there is no tangible employment action. When coworkers are the perpetrators, the plaintiff must prove employer liability using traditional agency principles." *Jensen v. Potter,* 435 F.3d 444, 452-53 (3d Cir. 2006)(internal citations and quotations omitted). Here, the burden is on Andreoli to prove that her employer is liable for her coworker's conduct by showing that "management knew or should have known about the harassment, but failed to take prompt and adequate remedial action." *Id.* at 453 (internal quotations omitted). The fact that Andreoli accepted a job on the same shift as DeLutiis is more significant if *Ellerth* is implicated, because a plaintiff's having availed herself of "preventive opportunities" is specifically at issue under *Ellerth*. However, it is not a necessary consideration when the issue is the employer's conduct and liability for a coworker's conduct, where *Ellerth* is not implicated. Andreoli's taking a position on the same shift as DeLutiis could, however, be considered by the jury as relevant to whether DeLutiis' behavior was truly objectionable, or in evaluating Andreoli's credibility.

Second, after reviewing the record, we conclude that, viewing the evidence in the light most favorable to Andreoli, there is scant evidence to support the conclusion that defendants

15

took prompt and adequate remedial action. At best, there is a genuine factual dispute as to whether defendants' purported remedial actions to address the ongoing harassment were prompt and adequate.

The evidence shows that Andreoli had to speak to five different supervisors about DeLutiis' behavior in order to elicit any response from management after she first began complaining of sexual harassment in 1989. Even then, management delayed more than five months in moving DeLutiis to a different shift and took no further action on the matter, such as investigating Andreoli's allegations, speaking to DeLutiis about the allegations of harassment, or giving him training regarding sexual harassment or appropriate behavior in the workplace. When Andreoli again reported that to her supervisor in 1996 that DeLutiis was stalking her and sexually harassing her, and that the harassment was ongoing, no action was taken to address the allegations. The supervisor to whom Andreoli spoke in fact discouraged her from speaking to anyone else about the harassment and noted that DeLutiis was known to engage in this type of behavior.

Management again took no real action after Andreoli complained in May 2000 that DeLutiis had threatened her by driving as though he was going to run her over. Management's only reaction to Andreoli's allegations that DeLutiis was engaged in a pattern of deliberate, potentially life-threatening harassment was to instruct DeLutiis to beep his horn if he drove near Andreoli. DeLutiis in fact denies that he was ever so instructed, but, more importantly, it is unclear how asking DeLutiis to beep his horn if Andreoli was in his way could be designed to address Andreoli's complaint that DeLutiis was

16

deliberately threatening her. When Andreoli again complained that DeLutiis had once more threatened her with his government vehicle in June 2000, it took two months for management to take any action and, ultimately, it addressed this matter by holding a traffic hearing concerning the general safety of DeLutiis's driving, without allowing Andreoli to present evidence regarding DeLutiis' past behavior and alleged intent to harass, injure or scare her. Over the course of the twelve years that Andreoli complained about DeLutiis' harassing and threatening behavior, the only instruction that DeLutiis ever received regarding his behavior towards Andreoli from DSCP management was a one-page memo given to him in August 2000, two months after the last incident of harassment and after Andreoli had already left the DSCP with medical problems.

Since a reasonable juror could find that management at the DSCP failed to take prompt and adequate remedial action after learning of the alleged harassment against Andreoli, we will reverse the District Court's order granting summary judgment to Andreoli's employer on her Title VII hostile work environment claim. A jury should decide whether Andreoli can prove the five elements of a claim for hostile work environment.[6]

---

[6] On defendants' motion for summary judgment, the District Court addressed only the second and fifth elements of Andreoli's claim because the parties did not dispute the remaining elements. App. at 16. The Court concluded that there was a genuine dispute as to whether the discrimination Andreoli suffered was pervasive and regular, but that summary judgment should be granted in favor of defendants because

17

## B. Retaliation

In order to prevail on a claim for retaliation under Title VII, an employee must prove that (1) she engaged in a protected employment activity, (2) her employer took an adverse employment action after or contemporaneous with the protected activity, and (3) a "causal link" exists between the adverse action and the protected activity. *Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir. 2001). While Andreoli does not provide in either her complaint or her briefs a complete list of the alleged adverse employment actions to which she was subjected, we gather from her March EEO complaint that these included: (1) the delay of her scheduled promotion in June 1999; (2) the denial of an appropriate work area in June 1999; (3) the denial of an equal training opportunity in January 2000; and (4) the denial of a performance award in March 2000. App. at 186-87. The District Court granted summary judgment in favor of defendants on Andreoli's claim for retaliation because, even assuming Andreoli could show that she suffered an adverse employment action, she failed to establish that any of the alleged adverse actions were causally connected to the protected employment activities in which she engaged. We agree that Andreoli has failed to proffer sufficient evidence to allow a reasonable juror to find a causal link between Andreoli's

---

Andreoli had not established *respondeat superior* liability. App. at 18a. Since we conclude that a reasonable juror could find Andreoli's employer liable on this claim, on remand, the entirety of Andreoli's hostile work environment claim should be decided by a jury.

18

protected employment activities and the alleged adverse employment actions taken by her employer.

Title VII provides that:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). "Opposition" to discrimination "can take the form of 'informal protests of discriminatory employment practices, including making complaints to management.'" *Moore v. City of Philadelphia*, 461 F.3d 331, 343 (3d Cir. 2006) (quoting *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.,* 450 F.3d 130, 135 (3d Cir. 2006)).

Here, Andreoli engaged in activity protected by Title VII by complaining to her supervisors about DeLutiis' harassing behavior and by providing an affidavit describing DeLutiis' past harassment to be used in the investigation of the discrimination complaint filed by DeLutiis. In addition, Andreoli filed informal and formal complaints with her employer's EEO office about the hostile work environment at the DSCP.

After reviewing the evidence as a whole and viewing it in the light most favorable to Andreoli, we conclude that a reasonable juror could not conclude, or infer, that management's

19

alleged adverse actions were causally connected to Andreoli's protected employment activities. There simply is insufficient evidence to connect these events, nor is their timing, standing alone, suggestive. The first of the alleged adverse employment actions did not take place until June 1999, about a decade after Andreoli first complained to management in 1989 about DeLutiis' behavior. Further, there is no evidence that Andreoli engaged in any protected employment activities around the time that management took the alleged adverse employment actions. The protected activity closest in time to her March 2000 formal complaint was in February of 1999, and that was more than four months before the first of the alleged adverse actions took place in June. We find that the five-month time period between Andreoli's informal complaint in February and the first alleged adverse action in June is, without additional evidence, insufficient to raise an inference of causation. Andreoli, moreover, has not proffered any evidence that the supervisors responsible for the alleged adverse actions were aware that Andreoli had informally complained to the EEO office in February. Accordingly, we will not disturb the District Court's ruling on this claim.

### C. Rehabilitation Act

Andreoli argues that she is "disabled" within the meaning of the Rehabilitation Act and that her employer violated the Act by failing to provide her with a reasonable accommodation. To make out a prima facie case of discrimination under the Rehabilitation Act, an employee must first demonstrate that she has a disability. *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 229 (3d Cir. 2000). Andreoli argues that she is disabled under

the Rehabilitation Act because her impairments – depression and Post-Traumatic Stress Disorder ("PTSD") – substantially limit her in the major life activities of working, thinking, concentrating, and interacting with others. *See* 29 U.S.C. § 705(20)(B)(defining "individual with a disability" under the relevant portion of the Act as "any person who has a physical or mental impairment which substantially limits one or more of such person's major life activities" or has a record of such an impairment, or is regarded as having such an impairment).

Andreoli proffered her deposition testimony and three medical evaluations as evidence of her disability. Andreoli testified that, after experiencing a panic attack in mid-July of 2000, she was unable to go to work and was counseled by her family physician to consult a psychiatrist. App. at 624. She then began seeing a psychiatrist on a regular basis and took leave from the DSCP on her psychiatrist's recommendation. Andreoli stated that, at this time, she was experiencing "major depression" and at times could not get out of bed or care for her child. She noted that she "had trouble concentrating, thinking, interacting with others." App. at 627. Andreoli also declared that she "definitely" cannot work in the environment at DSCP, although she stated in her request to the DSCP for a reasonable accommodation that she would be able to work at the DSCP as long as she did not work on the same shift as DeLutiis. Andreoli testified at her deposition that she does not "think" that she is physically able to work in an office setting, but is trying to work "in another type of field." *Id.*

The medical evaluations by doctors who examined Andreoli do not provide any additional details as to Andreoli's

21

limitations that would render her "disabled" within the meaning of the Rehabilitation Act. Rather, they note her inability to return to work at the DSCP. However, "the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(I).

Andreoli urges that the approval of her occupational disease claim for PTSD and severe depression by the U.S. Department of Labor's Office on Workers Compensation in August 2001 and her receipt of workers' compensation benefits is evidence that she is disabled. However, the standard for receipt of workers' compensation benefits under the Federal Employees' Compensation Act ("FECA") is different than the standard for whether a person is "disabled" within the meaning of the Rehabilitation Act. *Compare* 29 U.S.C. § 705(20)(B) (requiring that an individual have "a physical or mental impairment which substantially limits one or more of such person's major life activities" in order to be "disabled" under Rehabilitation Act), *with* 5 U.S.C. § 8102(a) (FECA provision requiring that the "United States shall pay compensation ... for the disability or death of an employee resulting from personal injury sustained while in the performance of his duty"), *and* 20 C.F.R.§ 10.5 (defining "disability" under the FECA as an "incapacity, because of an employment injury, to earn the wages the employee was receiving at the time of injury").

The District Court concluded that a reasonable jury could not find that Andreoli is disabled, in light of the undisputed evidence that Andreoli was able to get married, finish her bachelors degree, and attend nursing school after she allegedly

22

became disabled. App. at 28. The Court noted that all of the activities in which Andreoli engaged require thinking, concentrating, and interacting with others. In addition, Andreoli failed to show that she is substantially limited in the major life activity of working because she did not offer evidence to show that she is precluded from engaging in "a broad class of jobs." *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999). We agree with the District Court that a reasonable juror could not find, based on the proffered evidence, that Andreoli is "disabled" within the meaning of the Rehabilitation Act and we will therefore affirm the grant of summary judgment in favor of defendants on this claim.

### III.

For the foregoing reasons, we will AFFIRM the grant of summary judgment in favor of defendants on the Title VII retaliation and Rehabilitation Act claims, and we will REVERSE the District Court's grant of summary judgment in favor of defendants on the Title VII hostile work environment claim and REMAND for further proceedings on that claim.