

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-31-2007

# Horne v. MVM Inc

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-5454

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Horne v. MVM Inc" (2007). *2007 Decisions.* Paper 676.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/676

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No:  05-5454
_____

MARK HORNE; DONALD RHODES; and TIA THOMAS, as
Proposed Executrix of the Estate of Kerry Thomas,

Appellants

v.

MVM, INC.
a Virginia corporation
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 04-cv-00911)
District Judge:  Honorable Joel A. Pisano
_____

Argued June 27, 2007

Before BARRY, FUENTES and JORDAN, *Circuit Judges*.

(Filed: July 31, 2007)
_____

David Zutchni  [ARGUED]
Zatuchni & Associates, LLC
2 Research Way, 3rd Fl. East
Princeton, NJ   08540
    *Counsel for Appellants*

Jason M. Branciforte
Katherine A. Goetzl   [ARGUED]
Littler Mendelson, P.C.
1150 17th Street, NW - #900
Washington, DC   20036
    *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Plaintiffs Mark Horne, Tia Thomas,[1] and Donald Rhodes (collectively, "Plaintiffs") appeal from the order of the United States District Court for the District of New Jersey granting summary judgment in favor of Defendant MVM, Inc. ("MVM"). Plaintiffs argue that the District Court erred because it failed to consider evidence upon which a reasonable factfinder could conclude that race was a motivating factor in MVM's decision not to hire them.  For the following reasons, we will vacate the order of the District Court and remand for further proceedings.

I.

The General Services Administration (the "GSA") periodically awards a contract (the "GSA Contract") to private companies that, by the contract, agree to provide security services at certain federal government buildings in New Jersey.  Prior to October 1, 2002,

_____

[1]Originally, Kerry Thomas was a plaintiff.  Although he is now deceased, the litigation of his claim continues through the efforts of his daughter Tia Thomas, who is the proposed executrix of his estate and has been substituted for him as a plaintiff in this case.  References herein to "Plaintiffs" in discussion of the case background include Kerry Thomas, not Tia Thomas.

2

a company known as "Executive Security" had the GSA Contract. Plaintiffs, all of whom are African-American, worked as security guards for Executive Security pursuant to that contract. On October 1, 2002, GSA replaced Executive Security with MVM on the GSA Contract. However, though it was taking over the GSA Contract and would need to hire security guards, MVM chose not to hire all of the employees who were working for Executive Security. Plaintiffs were among those not hired by MVM.

On December 11, 2003, Plaintiffs filed a one-count complaint in the Superior Court of New Jersey, which was subsequently removed to the United States District Court for the District of New Jersey. The complaint alleged that MVM had discharged Plaintiffs on account of their race, in violation of the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 *et seq.* To substantiate their allegations of racial discrimination, Plaintiffs focused on the hiring decisions of a particular MVM employee, Jesus Vergel. Since 1997, Vergel had been employed in several capacities by Executive Security and, when MVM was awarded the GSA Contract in 2002, it hired Vergel to be the Project Manager. According to Plaintiffs, MVM initially asked Vergel to decide which other Executive Security employees it should hire, and then, in February 2003, MVM also put Vergel in charge of hiring any new security guards that were needed. Plaintiffs contend that Vergel used that hiring authority to reduce the number of African-Americans working as security guards under the GSA Contract.

II.

3

MVM filed a motion for summary judgment and a motion to strike allegedly inadmissible evidence that had been submitted by Plaintiffs. The District Court granted MVM's motion for summary judgment. In doing so, the Court first noted that Plaintiffs alleged in their complaint that they had been discharged by MVM on account of their race. Since it was undisputed that MVM had never hired Plaintiffs, the District Court construed the complaint as pleading a claim for discriminatory failure to hire. The Court then proceeded to analyze that claim under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[2] In its motion for summary judgment, MVM assumed that Plaintiffs could establish a prima facie case of discrimination. Therefore, the initial burden was on MVM to show a legitimate, nondiscriminatory reason for its decision not to hire Plaintiffs.

The District Court held that MVM had satisfied its burden by presenting evidence showing that the reason it did not hire Plaintiffs was because they had performed poorly while working for Executive Security. Specifically, MVM pointed to evidence that Horne had been repeatedly late for work, had been observed away from his post, and had been disciplined on multiple occasions. There was also evidence that Thomas had been habitually late or absent from work and that he had been involved in several incidents of insubordination. Lastly, MVM had evidence that Rhodes was caught sleeping at his post

---

[2]The New Jersey Supreme Court has applied the *McDonnell Douglas* framework to claims brought under the New Jersey Law Against Discrimination. *See Erickson v. Marsh & McLennan Co.*, 569 A.2d 793, 798-99 (N.J. 1990).

4

and was often rude to others. The District Court determined that MVM had knowledge of Plaintiffs' work-related problems and that therefore "it acted on legitimate, non-discriminatory bases in rejecting all of the Plaintiffs as employees." (Dist. Ct. Op. at 5.)

As a result, the District Court shifted the burden to Plaintiffs to demonstrate that the reason given by MVM was actually a pretext for discrimination. The Court found that Plaintiffs had failed to meet that burden, reasoning that:

> Even assuming arguendo Plaintiffs have observed some flaw in MVM's position, the Court finds, at a minimum, that the record simply does not allow a juror to reasonably conclude that MVM fabricated its basis for declining to hire Plaintiffs as a pretext for racial discrimination. Moreover, the undisputed statistics do not support Plaintiffs' argument. Since October 1, 2002, MVM has hired 189 employees on the GSA New Jersey Contract. Of those employees, the majority of them (56% or 106) are African-American. Within the first three days after MVM assumed the Contract, MVM hired 79 (66%) African-Americans. When these motions were filed, MVM employed 118 employees on that Contract, and the majority of them (61 or 52%) are African-American.

(*Id.*) Therefore, the District Court concluded that Plaintiffs had not raised a genuine issue of material fact and granted summary judgment in favor of MVM. The Court noted that, because summary judgment was warranted, it did not need to reach the merits of MVM's motion to strike.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over the District Court's grant of summary judgment, and we apply the same well-known test for the propriety of summary judgment, *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007), namely, whether "the pleadings, depositions, answers to interrogatories, and admissions

5

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and whether "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Andreoli*, 482 F.3d at 647.

III.

Plaintiffs argue that the District Court failed to consider evidence that they claim was sufficient to defeat MVM's motion for summary judgment. Under the *McDonnell Douglas* framework, "to defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Because Plaintiffs have proffered evidence that, if admissible, raises a genuine issue of material fact under that test, we find that the District Court erred by granting MVM's motion for summary judgment without considering MVM's motion to strike, which challenged so much of that evidence as inadmissible.

Plaintiffs claim that they have submitted evidence that is sufficient to create a factual dispute as to whether racial animus was a motivating factor in MVM's decision not to hire them. First, there is evidence in the record showing that Vergel was

6

responsible for deciding which Executive Security employees would be hired by MVM. Vergel admitted that, in early August 2002, he began working part-time for MVM with the expectation that he would become Project Manager when MVM officially took over the GSA Contract. During that time, Charles Alvarez, MVM's Director of Government Services, emailed Vergel and asked him to prepare a list of those security guards with Executive Security that Vergel wanted to "keep." (Appx. at 310.) The email also directed Vergel to "[d]elete those officers that you need to but ensure that you will be able to document those you delete." (Appx. at 310.) In a later email, Vergel informed Alvarez that he had made some progress on the list. (Appx. at 311-12.)

Plaintiffs point out that Daniel Baez, a former Sergeant for Executive Security and MVM, confirmed that Vergel made the list that MVM had requested. In his deposition testimony, Baez said that he met with Vergel about two weeks before MVM took over the GSA Contract, and Vergel asked him to look over a list of Executive Security employees that were not going to be hired by MVM. (Appx. at 269-70, pp. 136-38.) That testimony, together with the email exchange between Vergel and Alvarez, is evidence from which a reasonable factfinder could infer that MVM made Vergel responsible for deciding which Executive Security employees would be hired by MVM.

Plaintiffs then assert there is evidence of racial animus in Vergel's decision making, and specifically in his decision not to hire them. They focus on a statement that Vergel allegedly made in the winter of 1999, while he was working at Executive Security. According to Baez, Vergel told him that there were "too many blacks" on the contract and

7

that there were not enough Hispanic and white security guards.  (Appx. at 293-94, pp. 325-26.)  MVM responds that, even assuming Vergel made the statement Plaintiffs attribute to him, it is of limited relevance because it occurred almost three years before MVM took over the GSA Contract.  The problem with MVM's argument is that the evidence of Vergel's racial animus, if admissible, does not end there.  Plaintiffs point to evidence in the record showing that Vergel used racial epithets on several occasions while he was working for Executive Security.  (*See, e.g.*, Appx. at 265, pp. 102-04 (Baez testified that, in 2001, Vergel referred to an African-American co-worker as a "black mother----er" and a "nigger."); Appx. at 86-87, pp. 72-75 (Kerry Thomas testified that he heard Vergel use the term "nigger."); Appx. at 90, pp. 99-100 (Kerry Thomas testified that he often heard Vergel refer to the African-American security guards as "difficult" or "hard to handle.").)

Plaintiffs also submit that, because nearly all of the Executive Security employees that MVM chose not to hire were African-American, it is evident that Vergel's decision was motivated by race.  MVM claims that it decided not to hire thirty-two former Executive Security employees and that twenty-one of the thirty-two (or about 66%) were African-American, ten (or about 31%) were Hispanic, and one was Caucasian.  (Appx. at 303-04.)  Plaintiffs dispute MVM's statistics on the basis of Baez's deposition testimony.  More specifically, Baez testified that, of the ten Hispanics that MVM claims it decided not hire, eight of them had either left their job before MVM took over or had decided not to apply for a position with MVM, and one of them was actually hired by MVM.  (Appx.

8

at 291-93, pp. 315-22.) That would mean that MVM chose not to hire twenty-three former Executive Security employees and that twenty-one of the twenty-three (or about 91%) were African-American, one was Hispanic, and one was Caucasian. Thus, viewing the evidence in the light most favorable to Plaintiffs, as we must when reviewing MVM's motion for summary judgment, it appears that almost all of the Executive Security employees who did not receive a position with MVM were African-American.

Next, Plaintiffs cite to evidence they claim shows that Vergel continued to discriminate on the basis of race after MVM took over the GSA Contract. After hiring some of Executive Security's former employees, MVM began hiring "new" security guards on October 1, 2002. MVM acknowledges that the authority to choose those new employees was passed on to Vergel in February 2003. (Appellee's Br. at 16.) Plaintiffs argue that Vergel again used his hiring authority to reduce the number of African-Americans working on the GSA Contract. According to the deposition testimony of Baez, in late 2002, shortly before Vergel was given the responsibility of hiring new security guards, someone had complained to Vergel that there were too many African-Americans on the GSA Contract. (Appx. at 280, pp. 195-96.) Although Vergel did not tell Baez who had complained, Baez recalled Vergel saying that he would personally "fix" that problem. (Appx. at 280, p. 197.) Baez also testified that, while he spoke with Vergel, he saw a list on Vergel's computer that identified the race of each current MVM employee. (Appx. at 279, pp. 191-93.)

9

Plaintiffs assert that MVM's hiring statistics further demonstrate that Vergel discriminated against African-Americans in order to "fix" the racial distribution at MVM. From October 2002 through January 2003, the period immediately before Vergel began making the hiring decisions, MVM hired sixty-nine new employees to work on the GSA Contract. (*Compare* Appx. at 374-75 (List of Executive Security Employees Hired by MVM), *with* Appx. at 422-24 (List of All Employees Hired by MVM).) Fifty-three of the sixty-nine new hires (or about 77%) were African-American, ten (or about 14%) were Hispanic, five (or about 7%) were Caucasian, and one was Native American. (Appx. at 422-24.) However, after Vergel took over in February 2003, only seventeen of forty-nine new hires (or about 35%) were African-American, seven (or about 14%) were Hispanic, twenty-four (or about 49%) were Caucasian, and one was Asian. (Appx. at 424-25.) Those statistics show that there was a significant decrease in the percentage of African-Americans hired, and a corresponding increase in the percentage of Caucasians hired, after MVM put Vergel in charge of hiring new employees.

Plaintiffs point out that this change did not go unnoticed among MVM employees. Duane Santos, a Sergeant at MVM, claims that he was present at a supervisors' meeting where the issue of race-based hiring was discussed. (Appx. at 35.) Apparently, at least some MVM employees were upset about how many Caucasian security guards were being hired. (Appx. at 35.) According to Santos, Vergel responded by explaining that MVM was "not Executive Security," and that MVM was going to continue hiring white security guards. (Appx. at 35.)

10

Despite the foregoing evidence cited by Plaintiffs, the District Court, in granting MVM's motion for summary judgment, stated that "the record simply does not allow a juror to reasonably conclude that MVM fabricated its basis for declining to hire Plaintiffs as a pretext for racial discrimination." (Dist. Ct. Op. at 5.) It appears that the District Court was persuaded by MVM's assertion that, since taking over the GSA Contract on October 1, 2002, the majority of employees it hired were African-American. In light of the entire record, we cannot agree that that statistic alone, even if accurate, is grounds for granting summary judgment in favor of MVM. On the contrary, the Plaintiffs' evidence, if admissible and viewed in the light most favorable to Plaintiffs, is sufficient to permit a reasonable factfinder to conclude that race was more likely than not a motivating factor in MVM's decision not to hire Plaintiffs.

MVM argues that the District Court properly ignored much of Plaintiffs' evidence because it was either inadmissible or not credible. In its briefing, MVM concentrates heavily on explaining why the statements allegedly made by Vergel are inadmissible hearsay. What MVM fails to recognize is that the District Court explicitly stated that it did not reach the merits of MVM's motion to strike. Because we must "review the record as it existed at the time summary judgment was entered," *Union Pacific Railroad Co. v. Greentree Transportation Trucking Co.*, 293 F.3d 120, 126 (3d Cir. 2002), and because

11

the District Court did not exclude any of Plaintiffs' evidence, that evidence is part of the record that we review.[3]

Since Plaintiffs have identified evidence in the record sufficient to defeat MVM's motion for summary judgment, we will vacate the decision of the District Court. However, in doing so, we intend no statement as to the admissibility of any part of Plaintiffs' evidence. Such evidentiary questions are for the District Court to address in the first instance.

IV.

For the foregoing reasons, we vacate the summary judgment order and remand to the District Court for further proceedings consistent with this opinion.

---

[3]So too is evidence from which Plaintiffs argue that a reasonable factfinder could disbelieve MVM's articulated reason for not hiring them. For example, MVM claimed that it did not hire Plaintiffs because of their poor performance records with Executive Security. However, Baez testified that a number of Hispanic employees who had poor performance records with Executive Security were nonetheless hired by MVM. (Appx. 295-97, pp. 331–40.) Plaintiffs contend that, if MVM decided to hire a number of employees with performance records similar to Plaintiffs, then it is inconsistent for MVM to claim that their decision to not hire Plaintiffs was based on performance. If admissible and viewed in the light most favorable to Plaintiffs, such evidence calls into question whether MVM's stated hiring reasons were pretextual. Whether the evidence, taken as a whole, is sufficient for a factfinder to reach that conclusion is not a matter we need to decide at this point, though the District Court may need to do so at some point.

12