

2007 Decisions

**Opinions of the United States Court of Appeals for the Third Circuit**

8-14-2007

# Feesers Inc v. Michael Foods Inc

Precedential or Non-Precedential: Precedential

Docket No. 06-2661

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Feesers Inc v. Michael Foods Inc" (2007). *2007 Decisions.* Paper 504.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/504

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————

No. 06-2661

—————

FEESERS, INC.,
Appellant

v.

MICHAEL FOODS, INC.;
SODEXHO, INC.

—————

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 04-cv-00576)
District Judge:  Honorable Sylvia H. Rambo

—————

Argued May 10, 2007

Before:   RENDELL, JORDAN and
ALDISERT, <u>Circuit</u> <u>Judges</u>.

(Filed: August 14, 2007 )

—————

Jeffrey L. Kessler     **[ARGUED]**
Johns F. Collins
Eamon O'Kelly
Dewey Ballantine
1301 Avenue of the Americas
New York, NY  10019

Steven M. Williams
Cohen, Seglias, Pallas, Greenhall & Furman
240 North Third Street, 8th Floor
Harrisburg, PA  17101
   *Counsel for Appellant*

Brett L. Messinger
Duane Morris
30 South 17 Street
United Plaza
Philadelphia, PA  19103-4196

Margaret M. Zwisler
Latham & Watkins
555 11th Street, N.W., Suite 1000
Washington, DC  20004
   *Counsel for Appellee Michael Foods Inc.*

Matthew M. Haar
Saul Ewing
Two North Second Street
Penn National Insurance Tower
7th Floor
Harrisburg, PA  17101

Christopher M. Sheehan
Martin F. Gaynor, III     **[ARGUED]**
Cooley, Manion & Jones
21 Custom House Street
Boston, MA  02110
  *Counsel for Appellee Sodexho Inc.*

---

OPINION OF THE COURT

---

RENDELL, *Circuit Judge*.

I.

Plaintiff Feesers, Inc. appeals the District Court's grant of summary judgment in favor of defendants Michael Foods and Sodexho in this antitrust action.  In its complaint, Feesers alleged that Michael Foods violated section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), by selling its potato and egg products at lower, and thus discriminatory, prices to Sodexho.  It further alleged that Sodexho violated section 2(f) of the Act, 15 U.S.C. § 13(f), by knowingly inducing the discriminatory pricing.

The District Court found that Feesers failed to prove the fourth element of its prima facie case under section 2(a), namely that the alleged discrimination had a prohibited effect on competition, because Feesers failed to show that it was in "actual competition" with Sodexho.  *See Feesers, Inc. v.*

3

*Michael Foods, Inc. & Sodexho, Inc.*, No. 04-Civ-576, slip op. at 23 (M.D. Pa. May 4, 2006). We will reverse because the District Court used the wrong standard in making this determination and we conclude that Feesers has proffered sufficient evidence of competition between itself and Sodexho for sales of food products to foodservice facilities to allow a reasonable factfinder to conclude that these companies are in "actual competition." Moreover, the District Court erroneously put the burden on Feesers to prove not only "actual competition," but also that Michael Foods' discriminatory pricing caused Feesers to lose sales to Sodexho, rather than placing the burden on Michael Foods to rebut the inference of injury to competition that arises from proof of a substantial price discrimination between competing purchasers over time.

## II.

Most of the underlying facts are undisputed. Where there is a dispute, we view the facts in the light most favorable to Feesers. *Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007).

The customers of Sodexho and Feesers are foodservice facilities that sell meals, snacks, and beverages, such as school, hospital, and nursing home cafeterias. Both Sodexho and Feesers sell food products to foodservice facilities in the States of Pennsylvania, New Jersey, Maryland, Delaware, and Virginia. Feesers is a full-line distributor of food and food-related products ("products") that distributes these products to institutional customers. Sodexho is a foodservice management company that provides facility management and operation services to its clients and, in most cases, also sells products to

4

the facilities. Sodexho does not warehouse and deliver products directly to its clients, but rather contracts with its clients to procure products for them and then subcontracts with distributors who distribute the products to the facilities. Both Feesers and Sodexho contract with foodservice facilities to provide them with products from Michael Foods. Michael Foods is a supplier of egg and potato products.

A foodservice facility will contract with either Sodexho or Feesers, but not both,[1] to buy food and food-related products. A foodservice facility may either contract with Sodexho for Sodexho to operate the facility and procure products,[2] or

---

[1] On a few occasions, both Sodexho and Feesers have served the same facility at the same time, but the facility contracted directly only with the foodservice management company, which in turn contracted with Feesers. Feesers was, at one time, the prime distributor for a foodservice management company called The Wood Company. Wood contracted for Feesers to be its "primary non-exclusive distributor." However, Sodexho purchased Wood part-way through the term of the Feesers-Wood primary distributor contract. The Feesers contract for the facilities previously serviced by Wood expired at the end of 2002 and was not renewed by Sodexho. Instead, Sodexho chose Sysco as its prime distributor for the region. App. 8127.

[2] When Sodexho takes on a facility as a client, Sodexho usually contracts with the facility both to procure food on behalf of the facility and to operate the facility. However, as counsel for Sodexho acknowledged at oral argument, there are a limited number of Sodexho-operated facilities for which Sodexho does

contract with Feesers for Feesers to procure products and the facility will self-operate or hire a third-party operator. To procure products for a facility, Feesers purchases products directly from Michael Foods and then resells the products to foodservice facilities.

Sodexho's process to procure products from Michael Foods for resale to foodservice facilities is a bit more complicated. Sodexho itself does not purchase products from Michael Foods, but employs a distributor, such as Sysco Corporation.[3] Although product suppliers like Michael Foods generate price lists that set forth the prices at which they sell food to distributors, Sodexho has negotiated lower deviated pricing with Michael Foods. The transaction proceeds as follows: Michael Foods sells products to Sodexho's designated distributor at list prices and the distributor, which is usually Sysco, then resells the products to Sodexho and provides Michael Foods with proof of delivery of products to Sodexho; Sysco invoices Michael Foods for the difference between the list price and the Sodexho-negotiated deviated price; Sodexho then purchases these products from Sysco pursuant to a "prime

not provide procurement services. For some healthcare facilities, Sodexho provides food management services, but the facility will handle its own food procurement. App. 1175, 1415 1255.

[3]Sysco is the designated "prime distributor" for Sodexho in 48 states. App. 2535. Sodexho usually determines which company will distribute the products to its facility clients, although in rare instances the facility may choose the distributor. App. 7920.

distributor agreement," which specifies the price that Sodexho will pay Sysco for each product. Under the agreement, Sysco sells the Michael Foods products to Sodexho for the Sodexho-negotiated price plus an agreed-upon markup. App. 9706. Sysco's resale price of Michael Foods' products to Sodexho reflects the lower prices in the deviated pricing agreement between Sodexho and Michael Foods. *See Feesers, Inc.*, slip op. at 5.

After Sodexho purchases the Michael Foods products from Sysco at the agreed-upon prices, it resells the products to a foodservice facility customer and charges the cost of the products to the customer as an "operating expense." The foodservice facility generally does not interact directly with Sysco or any other Sodexho-designated distributor. Instead, the facility pays Sodexho for the invoiced cost of the food – plus, in most cases, a "procurement expense" of 0.9% of the invoiced amounts – as part of the facility's reimbursement of Sodexho for "operating expenses." Thus, because Michael Foods charges Sysco less for products resold to Sodexho than it charges Feesers for the same products, Sodexho's customers pay less than Feesers' customers for these products.

Feesers' customers are, in general, self-operated facilities, while none of Sodexho's customers are self-operated.[4]

_____

[4]Entegra, a group purchasing organization ("GPO") affiliated with Sodexho, does serve self-operated facilities. Entegra provides its clients with access to a portfolio of contracts negotiated by Sodexho with suppliers of food and food-related products. A facility employing Entegra's services may use a

However, foodservice facilities may switch from being self-operated to being operated by a management company like Sodexho. When a self-operated facility that previously bought products from Feesers is converted to a Sodexho-operated facility, Sodexho operates the facility and generally also procures the new client's food products, thereby displacing Feesers. For example, the Jewish Home of Greater Harrisburg was self-operated and bought its products from Feesers. It then became a Sodexho-managed facility and stopped buying products from Feesers. St. Mary's Catholic School was also a Feesers customer and self-operated facility, which then switched to being operated by Sodexho and no longer buys products from Feesers. Sodexho will approach self-operated ("self-op") facilities to convert them to Sodexho-operated facilities. App. 1425 (Deposition of Christophe Rochette of Sodexho) ("[Y]ou asked me repeatedly, are we interested in converting self-op? That is what we are. So, I mean, I think that we should [be] clear that for the record, that yes, we convert self-op. That is what we do."). Sodexho has solicited at least five facilities served by Feesers to become Sodexho customers. Sodexho customers end up paying less for products from Michael Foods than they would pay if they were self-operated and purchased the same products from Feesers.

On the other hand, facilities also switch from being

Sodexho-contracted distributor or its own contracted distributor to distribute foods that the facility purchases pursuant to Entegra-negotiated price lists. Entegra, however, is a separate legal entity from Sodexho and is not a party to this action. App. 9100.

operated by Sodexho to being self-operated.  In these cases, Sodexho will no longer procure food for the facility and the facility will seek out another company, such as Feesers, from which to buy its food products.  The Meadows Nursing Home was a Sodexho customer and switched to being a self-operated facility and a Feesers customer, in part because Michael Foods agreed to give Feesers the same product pricing given to Sodexho.  In 1998, Sodexho lost nine accounts to self-operation.  App. 1426.  In 1999, eight Sodexho customers switched to being self-operated.  App. 1427.

Feesers sued Michael Foods and Sodexho in the United States District Court for the Middle District of Pennsylvania, alleging that Michael Foods violated section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), by selling products at discriminatory prices to Sodexho and that Sodexho violated section 2(f) of the Act, 15 U.S.C. § 13(f), by knowingly inducing the discriminatory pricing.  Defendants moved to dismiss the complaint on the grounds that Feesers had not adequately pled that it was in actual competition with Sodexho.  The District Court denied the motion and allowed the parties to proceed to discovery.  After discovery, the parties all moved for summary judgment.

The District Court found that Feesers had established three out of the four elements of its section 2(a) claim against Michael Foods: that sales were made to two different purchasers in interstate commerce; that the product sold was of the same grade and quality; and that defendant discriminated in price as between the two purchasers.  *Feesers, Inc. v. Michael Foods, Inc. & Sodexho, Inc.*, No. 04-Civ-576, slip op. at 10-18 (M.D.

9

Pa. May 4, 2006). First, the Court noted that there was no dispute that the goods purchased from Michael Foods were of the same grade and quality. *Feesers*, slip op. at 10. The Court also found that "because the facts that establish that Michael Foods sold products at different prices are not in dispute . . . price discrimination exists within the context of the Act." *Id*. at 11. Finally, as to the requirement that there be two purchasers in interstate commerce, the Court concluded that the facts show that Michael Foods sold to two purchasers, Feesers and Sysco. The Court concluded that this is a case of "third-line" discrimination, i.e., when a seller's price discrimination harms competition between customers of the favored and disfavored purchasers. *Id*. at 12 n.8. The Court did not reach the issue of whether Sodexho is a direct "economic" purchaser from Michael Foods, which would, presumably, make this a second-line discrimination case (i.e., discrimination that harms competition between two purchasers). Defendants do not challenge these findings on appeal.[5]

---

[5]The parties do not debate whether this is a second- or third-line discrimination case, but we note that the District Court's conclusion that this is a case of third-line discrimination appears to be incorrect. This is not clearly either a second-line or third-line case, but falls somewhere in between these categories. *See George Haug Co. v. Rolls Royce Motor Cars, Inc.*, 148 F.3d 136, 141 n.2 (2d Cir. 1998) (noting that "secondary-line price discrimination[] occurs when a seller's discrimination impacts competition among the seller's customers; i.e. the favored purchasers and disfavored purchasers . . . tertiary-line [discrimination] occurs when the seller's price discrimination harms competition between customers of the favored and

However, the District Court found that Feesers failed to proffer sufficient evidence to prove the fourth element of its prima facie case: that the discrimination had a prohibited effect on competition. *Id*. at 24. The District Court found that Feesers did not meet its burden to show that it was in "actual competition" with Sodexho as of the time of the price differential. *Id*. at 23. The District Court noted that Feesers had

---

disfavored purchasers, even though the favored and disfavored purchasers do not compete directly against another"). This is a difficult case to categorize because the discrimination allegedly impacts competition between the disfavored purchaser (Feesers) and the customer of the favored purchaser (Sodexho).

This case is most analogous to *Texaco v. Hasbrouck*, 496 U.S. 543 (1990), in which several gas retail stations brought suit against Texaco for selling gas to two distributors at discounted prices. The distributors then resold gas to retail stations that competed directly with plaintiffs and they also operated their own retail stations that competed directly with plaintiffs. *Id.* at 549-51. The Supreme Court did not categorize the case as a second- or third-line case, but instead observed that "[t]he additional link in the distribution chain does not insulate Texaco from liability if Texaco's excessive discount otherwise violated the Act." *Id.* at 567; *see also Perkins v. Standard Oil Co.*, 395 U.S. 642 (1969) (finding actionable price discrimination resulting in injury to competition between disfavored purchaser and customer of customer of favored purchaser, but not categorizing the case as third-line or fourth-line discrimination). Regardless, categorizing the discrimination at issue in this case as second- or third- line is not essential, so long as the there is a prohibited effect on competition.

11

failed to prove that it competes with Sodexho "at the same functional level." *Id.* at 21. The Court also found that Feesers failed to proffer evidence that it lost customers to Sodexho *because of* food prices, rather than for other reasons relating to the management services Sodexho provides. Without this evidence, the Court found that Feesers could not prove that it competes with Sodexho. Accordingly, because Feesers failed to establish a prima facie case under section 2(a) of the Act, the Court granted summary judgment in favor of defendants and denied Feesers' motion for summary judgment.[6] *Id.* at 24. Feesers now appeals.

### III.

We exercise plenary review over the District Court's grant of summary judgment in favor of defendants, and we apply the same standard that the District Court should have applied. *Andreoli*, 482 F.3d at 647. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000).

---

[6]The District Court noted that, given that Feesers was unable to establish a section 2(a) claim, its section 2(f) claim against Sodexho "necessarily fails." *Feesers*, slip op. at 24.

Section 2(a) of the Robinson-Patman Act, 15 U.S.C. §13(a), provides in relevant part that:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

As the District Court correctly stated, in order to prove a violation of section 2(a) of the Robinson-Patman Act, a plaintiff must show (1) that sales were made to two different purchasers in interstate commerce; (2) that the product sold was of the same grade and quality; (3) that defendant discriminated in price as between the two purchasers; and (4) that the discrimination had a prohibited effect on competition. *See Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 556 (1990). This appeal concerns the fourth element of Feeser's claim under section 2(a): competitive injury. Specifically, we must decide whether the District Court

13

applied the correct legal standard to determine whether Sodexho and Feesers are in actual competition and whether it erred in holding that Feesers did not proffer sufficient evidence to allow a reasonable factfinder to conclude that it is in actual competition with Sodexho.

To establish the fourth element of its prima facie case against Michael Foods, Feesers was required to show that there is "a *reasonable possibility* that [the] price difference may harm competition," i.e., "competitive injury." *Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 434-35 (1983) (emphasis added). As we stated in *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, "[i]n keeping with the Act's prophylactic purpose, designed to prevent the occurrence of price discrimination rather than to provide a remedy for its effects, section 2(a) does not require that the discrimination must in fact have harmed competition. Instead, a reasonable possibility of harm, often referred to as competitive injury, must be shown." 909 F.2d 1524, 1531 (3d Cir. 1990) (internal citations and brackets omitted).

"Competitive injury" is established prima facie by proof of "a substantial price discrimination *between competing purchasers over time*."[7] *Falls City Indus.*, 460 U.S. at 435

---

[7]Although the purchasers in *Falls City Industries* were in actual competition with one another, injury to competition between a purchaser and a customer of a purchaser is also actionable under the Act. As the Supreme Court made clear in *Perkins v. Standard Oil Co.*, 395 U.S. 642 (1969), there is no basis in the Act for immunizing price discrimination "simply because the product in question passed through an additional

14

(citing *FTC v. Morton Salt Co.*, 334 U.S. 37, 46, 50-51 (1948); *id.* at 60 (Jackson, J., dissenting in part)) (emphasis added). In order to establish a prima facie violation of section 2(a), Feesers does not need to prove that Michael Foods' price discrimination *actually* harmed competition, i.e., that the discriminatory pricing caused Feesers to lose customers to Sodexho. Rather, Feesers need only prove that (a) it competed with Sodexho to sell food and (b) there was price discrimination over time by Michael Foods.[8] This evidence gives rise to a rebuttable inference of "competitive injury" under § 2(a). *See Morton Salt*, 334 U.S. at

---

formal exchange before reaching the level of [the plaintiff's] actual competitor." *Id.* at 648.

[8]In *Volvo Trucks North America, Inc. v. Reeder-Simco GMC, Inc.*, the Supreme Court reiterated that "a permissible inference of competitive injury may arise from evidence that a favored competitor received a significant price reduction over a substantial period of time." 126 S. Ct. 860, 870 (2006). In that case, the jury verdict for the plaintiff was overturned because the plaintiff's evidence, which compared "occasions on which it competed with *non-Volvo* dealers for a sale to Customer A with instances in which other Volvo dealers competed with *non-Volvo* dealers for a sale to Customer B" failed to show that, over time, the defendant consistently favored other Volvo dealers over the plaintiff. *Id.* at 871. The plaintiff's evidence showed that the plaintiff competed directly with other Volvo dealers for a sale to a particular customer on only two occasions and failed to show that the price discrimination on those two occasions was significant. *Id.* at 872. Thus, the plaintiff's evidence was insufficient to raise an inference of competitive injury.

15

46. The inference, if it is found to exist, would then have to be rebutted by defendants' proof that the price differential was not the reason that Feesers lost sales or profits. *See Falls City Indus.*, 460 U.S. at 435.

The District Court required Feesers to prove too much. It placed the burden on Feesers to show not only that it "actually competes" with Sodexho, but also that "food costs and distribution are *the determining factors*" in a consumer's choice between hiring Sodexho or Feesers, i.e., that Sodexho's lower food prices are why customers switch from buying products from Feesers to buying products and management services from Sodexho. *Feesers*, slip op. at 45 (emphasis added). In the absence of such evidence, the District Court concluded that Feesers failed to establish "actual competition."

The District Court was concerned that Sodexho and Feesers are not at the same "functional level" and are therefore not in "actual competition" in the same market. This concern is understandable given that the facts of this case are somewhat unusual. First, the involvement of Sysco creates an additional link in the chain of distribution between Michael Foods and Sodexho, which does not exist in Feesers' distribution chain. Second, most alleged violations of section 2(a) of the Robinson-Patman Act involve competition between two traditional resellers, such as two food distributors or two retail gas stations, that buy commodities from a seller and then resell the commodities to customers. Here, however, Feesers is a traditional commodity reseller, while Sodexho resells commodities to clients only in conjunction with the sale of services, such as food preparation and facility management

16

services.

However, as we observed in *Stelwagon Manufacturing Co. v. Tarmac Roofing Systems, Inc*., the relevant question is whether two companies are "in economic reality acting on the same distribution level," rather than whether they are both labeled as "wholesalers" or "retailers." 63 F.3d 1267, 1272 (3d Cir. 1995). To determine whether Sodexho and Feesers compete to resell food products to the same group of customers, we must conduct a "careful analysis of each party's customers. Only if they are each directly after the same dollar are they competing." *M.C. Mfg. Co. v. Tex. Foundries, Inc*., 517 F.2d 1059, 1068 n.20 (5th Cir. 1975); *see also George Haug Co. v. Rolls Royce Motor Cars, Inc*., 148 F.3d 136, 141-42 (2d Cir. 1998) (noting that determining "the presence or absence of functional competition between purchasers of a commodity is simply a factual process which focuses on whether these purchasers were directly competing for resales among the same group of customers").[9] The District Court did not view the

---

[9]With due respect to our dissenting colleague, that Sodexho's business is of a "different character" than Feesers', Dis. Op. at 24, is beside the point when we are evaluating whether Feesers has established that it is in "actual competition" with Sodexho. The threshold question is whether a reasonable factfinder could conclude that Sodexho and Feesers directly compete for resales of Michael Foods products among the same group of customers. The difference in the character of these two businesses might very well be determinative at the next stage of the analysis discussed below, namely, in evaluating defendants' evidence that facilities choose to buy from Sodexho rather than Feesers

17

evidence, as it should have, in the light most favorable to Feesers, and instead found that Feesers and Sodexho do not compete, without giving due consideration to the evidence of actual competition proffered by Feesers.

The evidence here could lead to a different conclusion than that reached by the District Court. Although Sodexho resells Michael Foods products to foodservice facilities that it operates, while Feesers resells Michael Foods products to self-operated foodservice facilities, the evidence, viewed in the light most favorable to Feesers, shows that Feesers' customers and Sodexho's customers are not two separate and discrete groups of foodservice facilities. Feesers proffered evidence that customers may be self-operated for some time, then switch to Sodexho, or, alternatively, may be operated by Sodexho and then switch to self-operation. Two foodservice facilities, St. Mary's Catholic School and the Jewish Home of Greater Harrisburg, were Feesers customers and self-operated facilities, but then switched to being operated by Sodexho and no longer buy food from Feesers. App. 7072, 7139. Feesers also proffered evidence that the Meadows Nursing Home was a Sodexho customer and switched to being a self-operated facility and a Feesers customer, in part because Michael Foods agreed

for reasons unrelated to Sodexho's lower food prices. It may well be found, based on defendants' evidence, that the different character of Sodexho's business, rather than its lower food prices, causes customers to buy food from Sodexho rather than Feesers. If this is the case, then Feesers' claim under the Robinson-Patman Act fails. However, this is not the same as finding that they are not in "actual competition."

to give Feesers the same pricing as it gives to Sodexho. App. 7073. There is also evidence that Sodexho actively solicits self-operated facilities to become Sodexho-operated, and also loses some customers each year that decide to self-operate instead of using Sodexho's operation services.

Our dissenting colleague attributes customers' decisions to switch from buying products from Feesers to buying products from Sodexho to the fact that "clients may choose to switch between the market for unprepared food stuffs and the market for prepared meals." Dis. Op. at 33. He suggests that Sodexho does not sell unprepared food, but rather "prepared meals," and that we are confusing "cost accounting with actual business transactions" by concluding otherwise. *Id*. at 25. However, the record in this case belies that assertion. To the contrary, a factfinder could conclude that Sodexho sells unprepared food to its customers. The record is replete with agreements between facilities and Sodexho wherein the facilities are not charged for "prepared meals," but rather for the cost of unprepared food and supplies, the cost of labor, and a management fee. Sodexho in fact promotes its ability to get lower prices for the food products that its customers use in their facilities. Sodexho notes in its promotional materials that "food and supplies are a major portion of the cost of a food service program." App. 5121. It goes on to boast that its "extensive network of purchasing resources can lower the prices of food and supplies . . . while actually improving the quality of the products you use." *Id.* In its promotional materials and proposals to potential clients, Sodexho could not be more clear that it sells food products to its clients and passes along the price discounts that it is able to secure from its product suppliers in the price that it charges its

19

clients for the products.[10]  In fact, Sodexho's superior product prices are touted as resulting from Sodexho's "leveraging [its] procurement power as the industry's largest purchaser of food." App. 3806 (Proposal for Abington Friends School).  This is a major thrust of its sales pitch.[11]   Sodexho's charging its

[10]*See* App. 5121 (Proposal for Northern Burlington County Regional School District) ("Our reputation and size give us advantages over smaller food service management organizations.  In turn, the savings in which [sic] we obtain will be passed on to your District.  You will be charged the same prices as Sodexho Marriott Services pays for all products.  Your District will receive all the benefits of our volume and trade discounts, except for cash discounts.").

[11]*See* App. 3622 (Proposal for Beth Sholom Home of Eastern Virginia) ("Utilization of the Sodexho purchasing program provides great financial benefits to our partner facilities.  As the industry leader in food procurement with purchasing responsibility for approximately 5,300 facilities throughout the United States, Sodexho is able to purchase food at pricing that is not able to be realized by smaller organizations."); App. 3650 (Proposal for Lancaster Regional Medical Center) ("Sodexho Marriott Services clients benefit from the combined purchasing power of our company with Marriott International, Inc. and Sodexho Alliance.  Our food and supply prices are exceptional, as are the quality and systems used to support the purchasing function.  In addition to those savings, you enjoy discounts on many other items you buy, such as food service equipment, laboratory sinks, uniforms for front desk or security personnel, light bulbs, carpet, etc.  Our prices for most items range from 5

customers for the cost of food products cannot be characterized as mere "cost accounting" any more so than any other business' charging a customer for invoiced goods is just "cost accounting." At minimum, Feesers has proffered sufficient evidence to create a genuine factual dispute as to whether Sodexho and Feesers both resell food products to the "same group of customers."

If substantial price discrimination between competing purchasers over time is established, then the inference of competitive injury arises. *See Morton Salt*, 334 U.S. at 46. However, this inference is not irrebuttable. As the Supreme Court stated in *Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428 (1983):

> In *Morton Salt* this Court held that, for the purposes of § 2(a), injury to competition is established prima facie by proof of a substantial price discrimination between competing purchasers over time. 334 U.S., at 46, 50-51, 68 S.Ct., at 828, 830-831; see *id.,* at 60, 68 S.Ct., at 835 (Jackson, J., dissenting). *In the absence of direct evidence of displaced sales, this inference may be overcome by evidence breaking the causal connection between a price differential and lost sales or profits*. F. Rowe, Price Discrimination Under the Robinson-Patman Act 182 (1962); see *Chrysler Credit Corp. v. J. Truett Payne Co.,*670 F.2d 575, 581 (CA5 1982).

to 25% lower than the next best price.").

21

*Id.* at 435 (emphasis added). The inference could be rebutted with evidence proffered by defendants that the price discrimination does not cause foodservice facilities to decide to buy food from Sodexho rather than Feesers. However, the District Court improperly put the burden on *Feesers* to prove that a difference in the price of products causes facilities to switch from buying from Feesers to buying from Sodexho. *Feesers*, slip op. at 22 ("It is undisputed that Michael Foods offered Feesers pricing that matched its pricing to Sodexho because the Meadows was a Sodexho client, however, Feesers failed to establish that the availability of that pricing was the determining factor for the Meadows in making the switch."). This was error. The burden is on defendants to show the absence of the causal link.

Our dissenting colleague takes issue with the Robinson-Patman Act on policy grounds and urges that we are applying it too broadly, so as to render price discrimination between non-competitors a violation of the Act. We reject this characterization of the record before us, and suggest that Congress has written the law, and courts have construed it, to apply to situations where discriminatory pricing poses a threat to competition. Viewing the evidence in the light most favorable to Feesers, a factfinder could conclude that this is such a situation. Therefore, it is for the factfinder, here the District Court, to decide whether defendants' actions fit within the contours of what Congress has proscribed. We will remand for it to do so.

IV.

22

Accordingly, for the reasons set forth, we will reverse the grant of summary judgment in favor of defendants and remand for further proceedings consistent with this opinion.

JORDAN, *Circuit Judge*, dissenting.

To prove its case under the Robinson-Patman Act, Feesers has tried to show that it is in actual competition with Sodexho. Feesers has argued at length about customers switching from self-operation to outsourcing and back again. Those arguments, however, start with the premise that Feesers and Sodexho sell the same products. The evidence is to the contrary, and, in my view, Feesers has failed to raise a genuine issue of material fact on this crucial point. Because summary judgment for Michael Foods and Sodexho is proper on that basis alone, I respectfully dissent.

I

The undisputed evidence in this case demonstrates that Sodexho's business is of a very different character than Feesers's. Feesers buys unprepared food from suppliers, such as Michael Foods, and resells that unprepared food to its institutional clients. Feesers's involvement ends there. Its clients then take the unprepared foods and prepare meals for their individual customers. Sodexho, on the other hand, is a food management company that contracts with institutions to manage food service operations. Its institutional clients do not themselves provide food service. Instead, Sodexho buys the unprepared food, prepares meals, and sells the prepared meals

23

to individual customers. Unlike Feesers, Sodexho does not sell unprepared food.[12]

Feesers inaccurately claims the contrary is true. Relying on a contortion of terms in Sodexho's contracts with some of its institutional clients, Feesers says that Sodexho does distribute unprepared foods. More specifically, because Sodexho is sometimes reimbursed by its customers for certain operating expenses, including the cost of food, Feesers contends that Sodexho is selling unprepared food products to its clients. The District Court agreed, stating that Sodexho sells food to its institutional clients, because "[t]he Sodexho proposals and contracts that Feesers has provided as evidence establish that Sodexho, at least in some cases, accounts for food costs as a separate line item within operating costs when billing accounts." Feesers's argument and the District Court's conclusion, which, I regret, my colleagues in the majority have accepted, confuses cost accounting with actual business transactions. There is a world of difference between the two. *Cf. Creque v. Texaco*

---

[12]I agree with the majority, Maj. Op. at note 4, that we should not consider the activities of Entegra Procurement Services, LLC. While it is a wholly-owned subsidiary of Sodexho, Entegra is a separate legal entity. Feesers has not presented a sufficient basis for piercing the corporate veil and holding Sodexho liable for Entegra's actions. That leaves the question of whether Michael Foods could be liable for discriminating in favor of Entegra rather than Sodexho. However, Feesers has not made out a prima facie case of price discrimination based on sales made to Entegra, because Feesers has failed to present any evidence of such sales.

*Antilles Ltd.*, 409 F.3d 150, 154 (3d Cir. 2005) (holding that a conveyance of property was not actually a sale despite the use of accounting formalities, because "we must look beyond formalities and accounting entries to the true nature of the conveyance").

Sodexho and its clients agree to allocate costs and profits in various ways. For some of its clients, Sodexho operates the food service and assumes all responsibility for either making a profit or losing money. (Appx. at A1545, 12:5-8.) If sales are less than costs for those accounts, Sodexho bears the loss. (*Id.* at A1545, 12:9-11.) For other clients, Sodexho is reimbursed for operating costs and charges a management fee, with the remaining profit or loss either going to the client or being shared between the client and Sodexho. (*Id.* at A1546-48, 13:10-15:21.) In those cases, Sodexho invoices the client for specified operating expenses, including software, information systems, decorations, delivery services, unprepared food stuffs, and salaries for Sodexho employees. (*Id.* at A2160-61, A2177-78, A2195-96, A2215-16, A2233-34; *see also id.* at A1256-66.)

Sodexho's receiving reimbursement of such expenses according to these contracts is nothing more than an accounting method that allows Sodexho and its clients to allocate potential profits or losses. The accounting method does not mean that Sodexho is in the business of selling unprepared food, any more than it means Sodexho is a a seller of computer software, or of accounting services, or decorations, or any other specifically listed operating expenses. If Microsoft tried to claim Sodexho was competing with it for software sales, it would be only marginally more of a stretch than Feesers's claim. There is no

25

evidence supporting the notion that any Sodexho client calls and asks for a hundred bags of frozen potatoes, as they might when calling Feesers. They call Sodexho when they want prepared french fries and other ready-to-eat food for their customers. The cost accounting provisions in the Sodexho contracts simply do not support the conclusion that Sodexho sells unprepared food products in competition with Feesers.[13]

We are left, then, with the following facts. Feesers buys and resells unprepared food. Sodexho buys unprepared food, prepares meals, and then sells the prepared meals. The precise legal issue presented is whether those facts raise a genuine issue as to "actual competition" between Feesers and Sodexho, as that requirement is properly understood under the Robinson-Patman Act. As discussed below, I do not believe they do.

---

[13]Likewise, Sodexho's promotional materials, which tout its ability to negotiate low acquisition prices for unprepared foods, do not demonstrate that it sells unprepared food to its clients. Those materials do not change the fact that Sodexho buys unprepared food and, instead of reselling it, uses it in a business that changes it into a different product, namely prepared meals. That Sodexho is able to operate at lower cost is important to its institutional clients not because those clients have any interest in repurchasing unprepared food. They do not, since they are not self-operating cafeterias. It is important because lower operating costs translate into more profit to be shared by Sodexho and the clients. Thus, the majority opinion is, I believe, mistaken to rely on those promotional materials as showing that Sodexho is in the business of reselling the unprepared food stuffs it acquires from Michael Foods.

26

II

Some historical perspective is in order. The Robinson-Patman Act has been called the "Wrong Way Corrigan" of antitrust, because it "often operates to harm consumers for the benefit of weaker or less efficient dealers. It moves antitrust policy in precisely the wrong direction." Herbert Hovenkamp, *The Antitrust Enterprise* 192 (2005)**.** That this case is now moving forward for trial highlights both the misguided policy behind the Robinson-Patman Act and the blunt mechanisms used to enforce it. Summing up the virtually uniform disdain which antitrust experts have long had for the Act, Judge Robert Bork wrote almost thirty years ago that "[a]lthough [the Act] does not prevent much price discrimination, at least it has stifled a great deal of competition." Robert H. Bork, *The Antitrust Paradox* 382 (1978). This case demonstrates the Act's exceedingly counter-productive character.

First of all, as a theoretical matter, there is no reason to presume that price discrimination poses a threat to competition. Price discounts are generally good for consumers. The theory behind the Act is that one competitor may use a price difference to drive its (presumably smaller and weaker) competitors out of the market. In the absence of market power, however, such a scheme is highly unlikely to succeed. A manufacturer like Michael Foods generally has no interest in shutting down efficient distribution channels for its products, because it is locked in competition with other food suppliers. Distributors like Feesers that are unhappy with the prices charged by Michael Foods have the option, in a competitive market, to get eggs and potatoes elsewhere. Thus, any real threat to

27

competition requires monopolistic market power and could be dealt with under the Sherman Act, with the accompanying requirement for proof of such power.

That difference in required proof is crucial, and highlights why, even if price discrimination were a real threat to competition, the Robinson-Patman Act is not a good means to stop it. The *Morton Salt* inference discussed by the majority, Maj. Op. at Sec. III, allows plaintiffs to proceed to trial in a Robinson-Patman case without any proof that competition has been or will be harmed. Instead, such plaintiffs rely on the threat of harm to themselves as a proxy for threatened harm to competition. The difficulty is that a competitor will also be harmed by vigorous competition, if that competitor cannot adjust by becoming more efficient. The Act provides no way of distinguishing between an inefficient competitor and one that is harmed by an actual threat to competition itself.

These logical flaws in the Act have led to considerable academic criticism of it and have recently prompted the Antitrust Modernization Commission, which was created by statute and appointed by the President and the leadership of Congress, to recommend that Congress repeal the Act in its entirety. Antitrust Modernization Commission, Report and Recommendations, April 2007, at iii, 317-26. According to the Commission, the Act is "antithetical to core antitrust principles," because it "protects competitors over competition and punishes the very price discounting and innovation in distribution methods that the antitrust laws otherwise encourage." *Id*. at iii.

Now, I readily acknowledge that these policy concerns

28

cannot override the will of Congress, and I do not suggest that this Court should attempt to repeal the Act by construing it into the oblivion it so richly deserves. But, given the threat that an overly broad reading of the Act poses to desirable competition, this Court certainly should not read the Act to cover factual situations where only a tenuous argument can support its application.

That the Act should be construed relatively narrowly is not a radical approach. On the contrary, the Supreme Court has recently emphasized that the Act should be construed "consistently with broader policies of the antitrust laws." *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 126 S. Ct. 860, 873 (2006) (internal quotation marks omitted). Because lower prices are generally good for consumers, applying the Act broadly threatens to dampen desirable price competition, forcing consumers to pay higher prices for goods. To avoid that threat, the Supreme Court has stated that it will "resist interpretation [of the Act] geared more to the protection of existing *competitors* than to the stimulation of *competition*." *Id.* at 872 (emphasis in original). In particular, an interpretation of the Act that protects individual distributors rather than competition between brands ignores the "primary concern" of the antitrust laws with interbrand, rather than intrabrand, competition. *Id.*; *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 127 S. Ct. 2705, 2715 (2007) ("[T]he primary purpose of the antitrust laws is to protect this type of [interbrand] competition." (internal citation and quotation marks omitted)). We should be following the Supreme Court's lead in resisting such an interpretation. Instead, the decision today goes beyond even the protection of competitors to the protection of non-competitors.

29

The requirement that a claimant show actual competition limits the Act to its proper scope. "Mindful of the purposes of the Act and of the antitrust laws generally," the Supreme Court has explained that the Act "does not ban all price differences charged to different purchasers of commodities of like grade and quality." *Volvo Trucks*, 126 S. Ct. at 870 (internal quotation marks omitted). "[R]ather, the Act proscribes price discrimination only to the extent that it threatens to injure competition." *Id*. Therefore, while "a permissible inference of competitive injury may arise from evidence that a favored competitor received a significant price reduction over a substantial period of time," such an inference only arises if the two purchasers are in "actual competition." *Id*.; *see also Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1271 (3d Cir. 1995).

The competitive injury inference was first discussed some sixty years ago in the *Morton Salt* case. 334 U.S. 37, 50-51 (1948). There, small grocery stores were allegedly harmed by volume discounts on Morton brand salt that were given to large chain grocery stores. *Id*. at 41. That situation presented the paradigmatic set of facts that Congress was attempting to address with the Robinson-Patman Act. Congress sought to address the perceived evil of large chain stores securing volume discounts not available to small independently-owned stores. *Volvo Trucks*, 126 S. Ct. at 869 ("Congress responded to the advent of large chain stores . . . ."); *see also* Richard A. Posner, *The Robinson-Patman Act* 25-26 (1976) (calling the Act "the high-water mark of the anti-chain-store movement"). In *Morton Salt*, the competing stores purchased and resold the same commodity, table salt, to the same group of customers.

30

Last year, in *Volvo Trucks*, the Supreme Court declined to apply the *Morton Salt* inference, because the plaintiff, a Volvo dealer, had failed to show that it actually competed with the other dealers who allegedly received more favorable prices on trucks made by Volvo. 126 S. Ct. at 870-72. In a market that operates by bidding, the plaintiff could not show that it had ever directly competed on a bid with a favored dealer. *Id*. at 871. The Court compared the situation to the *Morton Salt* paradigm, stating that "there [was] no discrete 'favored' dealer comparable to a chain store or a large independent department store." *Id*. Thus, the Act did not prohibit the different prices offered to the Volvo dealers.

Until now, we too have limited the *Morton Salt* competitive injury inference to cases like *Morton Salt*. In *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, we held that the plaintiffs, including the same Feesers we see here,[14] competed with other distributors to buy and resell the same portion-controlled food products. 909 F.2d 1524, 1526-27 (3d Cir. 1990). More recently, in *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, we held that the plaintiff, a distributor of roofing products, could be in actual competition with a company that, although it was known as a manufacturer, actually purchased the identical roofing products and resold them to the same group of customers as did the plaintiff. 63 F.3d 1267, 1271-72 (3d Cir. 1995). In both cases, the "actual competition" arose from the resale of identical products to the same group of customers, just as in *Morton Salt*.

---

[14]By the time the *J.F. Feeser* case reached this Court, J.F. Feeser, Inc. had been renamed Feesers, Inc. 909 F.2d at 1526.

31

Similarly, the Court of Appeals for the Second Circuit has stated that "[d]etermining the presence or absence of functional competition between purchasers of a commodity is simply a factual process which focuses on whether these purchasers were directly competing for resales among the same group of customers." *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 141-42 (2d Cir. 1998) (citing *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 349 (1968)). In the *George Haug* case, a service station purchased and resold the same Rolls Royce automobile parts as a Rolls Royce dealer that allegedly received more favorable prices from the manufacturer. *Id.* at 141. Such direct competition for the resale of the same product to the same customers qualifies as "actual competition" under the Act.

In this case, Feesers has succeeded in removing the concept of "actual competition" from its foundations in *Morton Salt*. The undisputed facts show that Sodexho and Feesers do not sell the same products, not even some of the time. Feesers sells unprepared foodstuffs, while Sodexho prepares and sells meals. Sodexho does not provide unprepared food in addition to other services; it operates strictly in the separate market for prepared meals. The fact that clients may choose to switch between the market for unprepared food stuffs and the market for prepared meals does not make the markets the same and is, therefore, beside the point. To conclude that Feesers and Sodexho are in actual competition to sell to the same market, we would also have to conclude that grocery stores are in actual competition with restaurants because both types of businesses sell food. Even if, in the abstract, that could be called competition, the situation is far removed from the one in *Morton*

32

*Salt* and should not be held to satisfy the requirement for "actual competition" under the Act. By sending this case back for trial, we wrongly give credence to a theory of "actual competition" so broad as to effectively read the requirement out of the Act.

Because the facts here fail to show actual competition, as required for Feesers to prove its case, I would affirm the grant of summary judgment for the defendants, and I therefore dissent.