**FEESERS, INC., Appellant in No. 09–2993**

v.

**MICHAEL FOODS, INC.; Sodexho, Inc., Appellants in Nos. 09–2548 and 09–2952.**

**Nos. 09–2548, 09–2952, 09–2993.**

United States Court of Appeals, Third Circuit.

Argued Oct. 29, 2009.

Filed Jan. 7, 2010.

Lisa M. Card, Esq., John F. Collins, Esq., Jeffrey L. Kessler, Esq. (Argued), George E. Mastoris, Esq., Eamon O'Kelly, Esq., Susannah P. Torpey, Esq., Dewey & Leboeuf, New York, NY, Steven M. Williams, Esq., Cohen, Seglias, Pallas, Greenhall & Furman, Harrisburg, PA, for Feesers, Inc.

James S. Ballenger, Esq., Jennifer L. Giordano, Esq., Maureen E. Mahoney, Esq., Eric J. McCarthy, Esq., Margaret M. Zwisler, Esq., Latham & Watkins, Roy T. Englert, Jr., Esq. (Argued), Robbins, Russell, Englert, Orseck & Untereiner, Washington, DC, David A. Applebaum, Esq., Robert L. DeMay, Esq., David G. Parry, Esq., Leonard, Street & Deinard, Minneapolis, MN, Bridget E. Montgomery, Esq., Eckert, Seamans, Cherin & Mellott, Harrisburg, PA, Alfred C. Pfeiffer, Esq., Latham & Watkins, San Francisco, CA, for Michael Foods, Inc.

Scott P. Fink, Esq., Jennifer B. Furey, Esq., Martin F. Gaynor, III, Esq., Cooley, Manion & Jones, Boston, MA, Thomas Demitrack, Esq., Jones Day, Cleveland, OH, Hashim M. Mooppan, Esq., Glen D. Nager, Esq. (Argued), Jones Day, Washington, DC, Matthew M. Haar, Esq., Saul Ewing, Harrisburg, PA, for Sodexho, Inc.

Before: SMITH, FISHER, and NYGAARD, Circuit Judges.

## OPINION

SMITH, Circuit Judge.

■ This appeal by Feesers, Inc. ("Feesers"), a food distributor, arises out of a Robinson–Patman Act claim for unlawful price discrimination, 15 U.S.C. § 13 (the "RPA"), against Michael Foods, Inc. ("Michaels"), a food manufacturer, and Sodexo, Inc. ("Sodexo"),[1] a food service management company. Feesers claims that Sodexo was able to purchase egg and potato products from Michaels at a discounted price that was unavailable to Feesers. Following a bench trial, the District Court entered judgment for Feesers. We will vacate that judgment and instruct the District Court to enter judgment as a matter of law for Michaels and Sodexo. Feesers and Sodexo were not competing purchasers, and, therefore, Feesers cannot satisfy the competitive injury requirement of a prima facie case of price discrimination under § 2(a) of the RPA.[2] In doing so, we

---

1. Sodexho, Inc. changed its name to Sodexo, Inc. during the course of this litigation. We will refer to the company by its new name.

2. Section 2(a) of the RPA, in relevant part, states that:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the pur-

chases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition

hold that, in a secondary-line price discrimination case, parties competing in a bid market cannot be competing purchasers where the competition for sales to prospective customers occurs *before* the sale of the product for which the RPA violation is alleged.

When reviewing a judgment entered after a bench trial, we exercise "plenary review over [the] [D]istrict [C]ourt's conclusions of law" and its "choice and interpretation of legal precepts." *Am. Soc'y for Testing & Materials v. Corrpro Cos.*, 478 F.3d 557, 566 (3d Cir.2007) (internal quotations omitted). Findings of fact are reviewed for clear error. *Id.* The District Court had subject matter jurisdiction over this case under 28 U.S.C. § 1331, and we exercise appellate jurisdiction under 28 U.S.C. § 1291.

Michaels and Sodexo raise a host of issues in this appeal, but in light of this Court's decision in *Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*, 530 F.3d 204 (3d Cir.2008), and the Supreme Court's decision in *Volvo Trucks North America, Inc. v. Reeder–Simco GMC, Inc.*, 546 U.S. 164, 126 S.Ct. 860, 163 L.Ed.2d 663 (2006), we need address only the issue of whether Sodexo and Feesers were "competing purchasers" for purposes of the RPA. *Feesers, Inc. v. Michael Foods, Inc.*, 498 F.3d 206, 213 (3d Cir.2007) (quoting *Falls City Indus. v. Vanco Beverage*, 460 U.S. 428, 435, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983)).[3]

## I.

The following facts were found by the District Court after a bench trial. *Feesers, Inc. v. Michael Foods, Inc.*, 632 F.Supp.2d 414, 418 (M.D.Pa.2009).

### Structure of the Food Service Industry

The food service industry consists of a three-tier distribution system: manufacturers sell products to distributors, who resell those products to operators, including self-operators ("self-ops") and food service management companies. *Id.* at 420–21. Self-ops are institutions that perform all dining services internally. Food service management companies perform institutions' dining services for a fee, *id.*, and primarily target schools, hospitals, and nursing homes. Sometimes operators negotiate with manufacturers for discounted

---

with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered[.] . . . . *And provided further,* That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade: *And provided further,* That nothing herein contained shall prevent price changes from time to time where in response to changing conditions affecting the market for or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned.

15 U.S.C. § 13(a).

3. Three of the four requirements of a § 2(a) Robinson–Patman claim have already been established by Feesers and are not contested in this appeal. *Feesers, Inc.*, 498 F.3d at 208. Feesers has shown "that sales were made to two different purchasers[, Feesers and Sodexo,] in interstate commerce; that the product sold was of the same grade and quality; and that [Michaels] discriminated in price as between the two purchasers." *Id.* at 211. What remains for resolution by this Court is the fourth requirement, a showing "that the discrimination had a prohibited effect on competition." *Id.* at 212.

prices, known as "deviated prices." *Id.* at 432. In those instances, the distributor purchases the product at list price from the manufacturer, sells the product to the operator at the deviated price, and receives the difference between the list price and the deviated price from the manufacturer. *Id.* An operator may also seek discounts from manufacturers by joining a Group Purchasing Organization ("GPO"). A GPO is a collection of operators who negotiate food prices collectively to achieve greater bargaining power against manufacturers and distributors. *Id.* at 421. "GPOs generally bargain for a lower price, but do not actually purchase the food for resale to institutions." *Id.*

### The Parties in this Appeal

Michaels is a manufacturer of egg and potato products that sells in bulk, nationwide. *Id.* It is the largest producer of liquid eggs in the United States. *Id.* Feesers is a regional distributor that distributes Michaels's products, and others, to operators within a 200–mile radius of Harrisburg, Pennsylvania. *Id.* Sodexo is a multinational food service management company that serves institutions around the world. *Id.* Its services include planning menus, ordering food, preparing and serving meals, and overseeing labor issues. It is the largest private purchaser of food in the world. *Id.* Sodexo owns Entegra, a GPO. *Id.* at 427.

### Michaels's Pricing of Food Products

Michaels sells sixty percent of its products at deviated prices. *Id.* at 432. It has offered deviated pricing to self-ops since the mid–1990s and to food service management companies, like Sodexo, since at least 1999. "[O]n average from 2000 until 2004, Feesers paid $9.56, or 59% more than [Sodexo] for [Michaels's] eleven top selling products." *Id.* at 434. This pricing difference was described as "stunning" by Feesers's expert witness. *Id.* The deviated pricing Sodexo received from Michaels was not institution-specific, so Sodexo could "use its low deviated price . . . to win new accounts and to keep current customers." *Id.* at 432.

### Competition between Feesers and Sodexo

Feesers sells food to self-op institutions and food service management companies.[4] *Id.* at 421–22. Sodexo sells food in conjunction with its food service management services. *Id.* at 422. Institutional customers "regularly switch [between] self-op [and] management," and at least three institutions have switched between Feesers and Sodexo. *Id.*[5] Both companies regularly seek self-op business. *Id.* Feesers tries to distribute for self-ops while Sodexo tries to convert self-ops to food service management.

When a self-op switches to Sodexo, it relies on Sodexo to handle all dining services functions, such as procurement and distribution of food. *Id.* Sodexo itself is not a distributor, but it decides which distributors its customers will use. *Id.* Thus, when an institution switches from self-op

---

4. The District Court found that Feesers sold only to self-op institutions, *Feesers, Inc.,* 632 F.Supp.2d at 421–22. This finding was clearly erroneous. The District Court's own fact finding describing Feesers's business explains that Feesers distributed food for Wood, a food service management company. *Compare id.* ("Feesers only sells food to self-op institutions[.]"), *with id.* at 421 n. 3 ("Feesers was the primary distributor for the Wood Company," a food service management company.).

5. The Jewish Home of Greater Harrisburg and St. Mary's Catholic School both switched from Feesers to Sodexo. *Feesers, Inc.,* 632 F.Supp.2d at 422. The Meadows switched from Sodexo to Feesers. *Id.*

to Sodexo, the incumbent distributor who distributed for the self-op may be replaced. *Id.* Because Feesers could be displaced by Sodexo's chosen distributor if Sodexo wins a self-op's business, the two companies compete "when a customer considers switching from self-op to food service management, or vice versa." *Id.* at 430.[6] Accordingly, Feesers and Sodexo "compete[d] for the same portion of an institution's food service budget." *Id.* at 420.

Competition between Feesers and Sodexo occurred informally prior to the request for proposal ("RFP") process ordinarily required by large institutions.[7] *Id.* at 428. To grow its client base, Sodexo identifies institutions that meet its client profile and then builds relationships with those institutions. *Id.* at 428–29. During informal contacts with a prospective institutional customer, Sodexo "gauges the institution's interest in management and determines whether there are any particular problems to be solved." *Id.* at 428. If the institution is interested in management, it will then put out a RFP and Sodexo will follow through in that process. *Id.* Aside from seeking new clients, Sodexo also touts its access to discounted foods to its existing customers that utilize it for prepa-

ration and ordering of food, but not for distribution. *Id.* at 429. This is done, in part, to encourage those customers to switch to Sodexo's chosen distributor. *Id.*[8]

### Procedural History

On March 17, 2004, Feesers sought a declaratory judgment stating that (1) Michaels unlawfully discriminated in price under § 2(a) of the RPA by selling egg and potato products to Sodexo at significantly lower prices than it did to Feesers and (2) Sodexo violated § 2(f) of the RPA by knowingly inducing those discriminatory sales. 15 U.S.C. § 13(a) and (f). Feesers also sought permanent injunctive relief under § 16 of the Clayton Act. 15 U.S.C. § 26. On May 4, 2006, the District Court granted summary judgment for the defendants, concluding that Feesers had satisfied the first three elements of a prima facie case of price discrimination, but not the fourth element, competitive injury. "The District Court was concerned that [Sodexo] and Feesers [we]re not at the same 'functional level' and [we]re therefore not in 'actual competition' in the same market." *Feesers, Inc.,* 498 F.3d at 214.

Feesers appealed and this Court reversed.[9] We held that the District Court

---

6. We regard this inferred fact as highly questionable, but the finding does not rise to the level of clear error. In our view, assuming that Sodexo replaced Feesers with another distributor, Feesers's competitor would be the other distributor, not Sodexo.

7. Food service management companies compete with each other through a formal RFP process to win institutions' business. *Feesers, Inc.,* 632 F.Supp.2d at 428. The RFP process is usually limited to food service management companies. *Id.*

8. The District Court also identified other evidence showing competition between Feesers and Sodexo, including Sodexo's SEC filings, *Feesers, Inc.,* 632 F.Supp.2d at 422, and its internal strategic documents, *id.* at 423.

None of this evidence stated that Sodexo regarded any distributor as a competitor. *Id.* at 422–23 (noting that Sodexo's SEC filings identified lower overall costs of food service management as a means of promoting itself over self operation); *id.* at 425 ("Sodex[o]'s strategic planning documents do not specifically mention distributors as competitors[.]").

9. We reversed in a 2–1 decision. The dissent concluded that Sodexo and Feesers were not in actual competition because they "d[id] not sell the same products." *Feesers, Inc.,* 498 F.3d at 220 (Jordan, J., dissenting). In reaching that conclusion, the dissent explained that Feesers "res[old] ... unprepared foods to its institutional clients," whereas Sodexo "prepare[d] meals, and s[old] the prepared meals

had applied the wrong standard in concluding that Feesers and Sodexo were not in competition. *Id.* at 208. The panel explained the proper standard and remanded the case to the District Court for further proceedings.[10]

On remand, after a bench trial, the District Court entered judgment for Feesers and enjoined Michaels from engaging in unlawful price discrimination. Michaels then suspended all sales to Feesers. In response, Feesers sought an order of contempt and a permanent injunction forbidding Michaels from refusing to deal with Feesers. On May 26, 2009, the District Court held Michaels in contempt and enjoined it from refusing to "sell its products to Feesers on the same terms as they are sold to [Sodexo], so long as Feesers otherwise meets its standards as a customer." Michaels and Sodexo now appeal the District Court's judgment and the permanent injunction.

## II.

 " 'Competitive injury' [under § 2(a) of the RPA] is established ... by proof of 'a substantial price discrimination between *competing purchasers over time.*' " *Feesers, Inc.,* 498 F.3d at 213 (quoting *Falls City Indus.,* 460 U.S. at 435, 103 S.Ct. 1282) (footnote omitted) (emphasis in original). "Feesers does not need to prove that [Michaels's] price discrimination *actually* harmed competition, *i.e.,* that the discriminatory pricing caused Feesers to lose customers to Sodex[o]. Rather, Feesers need prove only that (a) it competed

with Sodex[o] to sell food and (b) [that] there was price discrimination over time by [Michaels]." *Feesers, Inc.,* 498 F.3d at 213 (footnote omitted) (emphasis in original).

To determine whether Feesers competed with Sodexo to sell food, "the relevant question is whether [the] two companies '[we]re in economic reality acting on the same distribution level.' " *Id.* at 214 (quoting *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.,* 63 F.3d 1267, 1272 (3d Cir. 1995)). Recognizing that the phrase "economic reality" provides little guidance in how to approach the competition inquiry, this Court, in the prior appeal in this case, explained that two parties are in competition only where, after a "careful analysis of each party's customers," we determine that the parties are "each directly after the same dollar." *Feesers, Inc.,* 498 F.3d at 214 (quoting *M.C. Mfg. Co. v. Tex. Foundries, Inc.,* 517 F.2d 1059, 1068 n. 20 (5th Cir.1975)). We refer to this dollar-for-dollar analysis as the competing purchaser requirement. The Supreme Court's guidance in *Volvo Trucks,* 546 U.S. at 179–80, 126 S.Ct. 860, and this Court's precedent in *Toledo Mack,* 530 F.3d at 226–29, compel us to conclude that Feesers and Sodexo were not competing purchasers. Thus, Feesers cannot satisfy the first element required to show competitive injury, and its RPA claims must fail as a matter of law.[11]

### A.

 In application, the competing purchaser requirement will vary based on the

---

to individual customers." *Id.* at 218. (Jordan, J., dissenting). The majority disagreed, noting that "a factfinder could conclude that Sodex[o] s[old] unprepared food to its customers" because some of Sodexo's agreements with institutional clients did not charge for " 'prepared meals,' but rather for the cost of unprepared food and supplies, the cost of labor, and a management fee." *Id.* at 215.

**10.** The prior decision is explained in Section IV(A), *infra.*

**11.** Because Feesers cannot satisfy the first element required to show competitive injury, we need not discuss whether it experienced price discrimination over time.

nature of the market and the timing of the competition. In a bid market, if the competition between the favored and disfavored purchaser occurs before the purchase of the goods from the seller, then the disfavored purchaser cannot show that it and the favored purchaser were competing purchasers. *Volvo Trucks,* 546 U.S. at 178–79, 126 S.Ct. 860. This rule prevents the application of the RPA to markets where the "allegedly favored purchasers [bear] little resemblance to [the] large independent department stores or chain operations" that the RPA was intended to target, *id.* at 181, 126 S.Ct. 860, and helps "construe the [RPA] 'consistently with the broader policies of the antitrust laws,'" *id.* (quoting *Brooke Group v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 220, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993)).

In practice, the rule, like other restrictions on the reach of the RPA, prevents the unprincipled application of the statute. Indeed, because the RPA often has "anticompetitive" effects that "promote rather than ... prevent monopolistic pricing practices," *Small Business and the Robinson–Patman Act: Hearings before the Special Subcommittee on Small Business and the Robinson–Patman Act of the House Select Committee on Small Business,* 91st Cong. 146–47 (1969) (testimony of Richard A. Posner), the Supreme Court, in seeking to construe the statute consistently with the broader policies of the antitrust laws, has repeatedly limited its reach by:

- Expanding the means through which RPA defendants can attack the "competition" element of a prima facie case of price discrimination, *Texaco v. Hasbrouck,* 496 U.S. 543, 561, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990) ("A supplier need not satisfy the rigorous requirements of the cost justification defense in order to prove that a particular functional discount is reasonable and accordingly did not cause any substantial lessening of competition between a wholesaler's customers and the supplier's direct customers.") (footnote omitted);

- Focusing the competition inquiry on "interbrand competition," *Volvo Trucks,* 546 U.S. at 180, 126 S.Ct. 860;

- Explaining that the RPA does not "ban all price differences charged to different purchasers of commodities of like grade and quality," *id.* at 176, 126 S.Ct. 860 (quoting *Brooke Group Ltd.,* 509 U.S. at 220, 113 S.Ct. 2578);

- "[R]esist[ing] interpretation[s] [of the RPA] geared more to the protection of existing competitors than to the stimulation of competition," *Volvo Trucks,* 546 U.S. at 181, 126 S.Ct. 860 (emphasis omitted); and,

- "[R]ecogni[zing] [that] the right of a seller to meet a lower competitive price in good faith may be the primary means of reconciling the [RPA] with the more general purposes of the antitrust laws," *Great Atl. & Pac. Tea Co. v. FTC,* 440 U.S. 69, 82 n. 16, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979) (interpreting RPA to provide robust meeting competition defense).[12]

This Court has dutifully followed the Supreme Court's lead by narrowly construing

---

**12.** *Accord Falls City Indus.,* 460 U.S. at 451–52, 103 S.Ct. 1282 (vacating judgment that defendant did not have a meeting competition defense); Cass Sunstein, *Interpreting Statutes in the Regulatory State,* 103 Harv. L.Rev. 405, 487 (1989) ("Courts should narrowly construe statutes that serve no plausible public purpose, and amount merely to interest-group transfers.... Th[is] idea helps explain a number of decisions in areas of economic regulation, such as ... the courts' approach to the Robinson–Patman Act.") (citing Robert H. Bork, *The Antitrust Paradox: A Policy at War with Itself* 409–10 (1978)).

the RPA. In *Toledo Mack*, we explained that we will "narrowly interpret" the RPA, even if doing so will result in "elevat[ing] form over substance." *Toledo Mack*, 530 F.3d at 228 n. 17.

While the competing purchaser requirement has its roots in *FTC v. Morton Salt*, 334 U.S. 37, 46–51, 68 S.Ct. 822, 92 L.Ed. 1196 (1948), the most recent decisions discussing that requirement are *Volvo Trucks* and *Toledo Mack*. Both decisions emphasized that proving "substantial price discrimination between competing purchasers over time," *Volvo Trucks*, 546 U.S. at 179, 126 S.Ct. 860 (quoting *Falls City Indus.*, 460 U.S. at 435, 103 S.Ct. 1282) (emphasis omitted), requires accounting for the timing of the alleged competition and the nature of the market. *Volvo Trucks*, 546 U.S. at 178–79, 126 S.Ct. 860; *see Toledo Mack*, 530 F.3d at 228.

In *Volvo Trucks*, the Supreme Court rejected an inference of competitive injury where the plaintiff, Reeder–Simco ("Reeder"), could not show that it was a competing purchaser. *Volvo Trucks*, 546 U.S. at 179–80, 126 S.Ct. 860. Reeder was a Volvo dealer who competed with other dealers (both Volvo brand and others) through a customer-specific bidding process for sales to individuals seeking custom-built trucks. *Id.* at 169, 126 S.Ct. 860. Reeder alleged that Volvo sold trucks to other Volvo dealers at unlawfully discriminatory prices, giving those other dealers an unfair advantage in selling to prospective customers. The customer-specific bidding process began with the customer stating its specifications and inviting bids from dealers it had selected. *Id.* at 170, 126 S.Ct. 860. The selected dealers would submit bids to the customer and the dealer that won the bid would arrange for the manufacturer, in this case, Volvo, to build the truck for the customer. *Id.* Like the deviated pricing system of food manufacturers, it was com-

mon for truck manufacturers to offer "customer-specific discounts to their dealers." *Id.* Prior to submitting a bid to a customer, a Volvo dealer would ask Volvo if it could get a discount for the customer. *Id.* Volvo would then decide on a case-by-case basis what discount it would grant a particular customer based on factors like industry-wide demand and whether the customer had previously purchased from Volvo. *Id.* While the discount varied based on many factors, the dealers always knew what discounts they could offer a customer before submitting their bids to the customer. *See id.*

The specific question presented in the case was whether "a manufacturer offering its dealers different wholesale prices may be held liable for price discriminations proscribed by Robinson–Patman, absent a showing that the manufacturer discriminated between dealers contemporaneously competing to resell to the same retail customer." *Id.* at 169, 126 S.Ct. 860. In deciding that question in the negative, the Supreme Court concluded that Reeder could not establish an inference of competitive injury based on the timing of the competition between the dealers and the nature of the market, Reeder's evidence of competitive injury, and the goals of the RPA.

The timing of the competition between the dealers and the nature of the market were critical to the Supreme Court's reasoning. At the initial stage of competition in the bid market, where dealers were competing to win the right to submit a bid to a customer, "competition [wa]s not affected by differential pricing [because] a dealer in the competitive bidding process approach[ed] Volvo for a price concession ... only after it ha[d] been selected by a retail customer to submit a bid." *Id.* at 178–79, 126 S.Ct. 860. Prospective customers chose which dealers could submit

bids based on a variety of factors "including the existence *vel non* of a relationship between the potential bidder and the [prospective] customer, geography, and reputation." *Id.* at 179, 126 S.Ct. 860. After the prospective customer chose who could submit bids, the relevant market narrowed to the few dealers who were chosen: "Once a retail customer has chosen the particular dealers from which it will solicit bids, 'the relevant market becomes limited to the needs and demands of a particular end user, with only a handful of dealers competing for the ultimate sale.' " *Id.* (quoting *Reeder–Simco GMC, Inc. v. Volvo GM Heavy Truck Corp.,* 374 F.3d 701, 719 (8th Cir.2004) (Hansen, J., dissenting)).

The Supreme Court was also unimpressed with Reeder's evidence purporting to show competitive injury. Reeder produced three types of evidence to support its allegations.[13] The two types of evidence relevant to the instant case were Reeder's "comparisons of [discounts] [it] received for four successful bids against *non-Volvo* dealers, with larger [discounts] other successful Volvo dealers received for

*different sales* on which [it] did not bid (purchase-to-purchase comparisons)," *Volvo Trucks,* 546 U.S. at 177, 126 S.Ct. 860 (emphasis in original), and "comparisons of [discounts] offered to [it] in connection with several unsuccessful bids against *non-Volvo* dealers, with greater concessions accorded other Volvo dealers who competed successfully for different sales on which [it] did not bid (offer-to-purchase comparisons)," *id.* at 177–78, 126 S.Ct. 860 (emphasis in original). These two types of evidence did not create an inference of competitive injury because (1) the alleged price discrimination did not occur for the same customer and (2) Reeder did not attempt to show that other Volvo dealers were consistently favored. *Id.* at 178, 126 S.Ct. 860.[14]

The Supreme Court also signaled that it was uninterested in permitting innovative applications of the RPA and would resist "interpretation[s] geared more to the protection of existing *competitors* than to the stimulation of *competition.*" *Id.* at 181, 126 S.Ct. 860 (emphasis in original). It

---

13. The first type, evidence of head-to-head comparisons between Reeder and other Volvo dealers, is not relevant in the instant case. Reeder's evidence showed only "two instances over [a] five year course" where it bid against other Volvo dealers, so called head-to-head comparisons: One instance where it and another Volvo dealer received the same discount and Reeder lost to the other dealer because the customer had previously bought from the other dealer, and one instance where it and the opposing Volvo dealer received matching discounts from Volvo and neither won the bid. *Volvo Trucks,* 546 U.S. at 172, 126 S.Ct. 860. On this evidence, the Supreme Court noted that Reeder showed the "loss of only one sale" and that "Reeder and the other dealer received the same concession" in that instance. *Id.* at 180, 126 S.Ct. 860. In the other instance of head-to-head competition, both Volvo dealers received the same concession and neither won the bid. *Id.* The Supreme Court concluded that "if price

discrimination between two purchasers existed at all, [a sale that would have resulted in $30,000 more in gross profits for Reeder] was not of such magnitude as to affect substantially competition between Reeder and the 'favored' Volvo dealer." *Id.*

14. Notably, in this case, Feesers produced evidence showing that Michaels consistently favored Sodexo. *Feesers, Inc.,* 632 F.Supp.2d at 434. This type of evidence was not produced in *Volvo Trucks,* so the Supreme Court never explained whether both or only one of its reasons for rejecting the inference of competitive injury need be rectified in order to infer competitive injury. 546 U.S. at 179 n. 3, 126 S.Ct. 860. As we later explain, this Court, in *Toledo Mack,* rejected the argument that evidence showing that a certain purchaser was consistently favored was sufficient to infer competitive injury in a bid market where the competition occurred prior to the actual sale. *Toledo Mack,* 530 F.3d at 228–29.

also noted that the custom truck market bore "little resemblance to [the] large independent department stores or chain operations" that the RPA originally intended to target. *Id.*

This Court used similar reasoning in *Toledo Mack.* 530 F.3d at 226–29. That case had facts similar to *Volvo Trucks*—Toledo, a Mack truck dealer, would submit bids to prospective customers who wished to purchase customized Mack trucks. *Id.* at 209. In creating a bid, Toledo would seek out a "transaction-specific discount [from Mack] known as 'sales assistance.'" *Id.* "The amount of sales assistance [Mack offered] varie[d] according to the nature of the relationship between the dealer and the customer, the number of trucks ordered, potential competition, and other factors." *Id.* Toledo sued Mack under the RPA, claiming that it consistently received less sales assistance than other Mack dealers.

In affirming the district court's grant of summary judgment for the defendant, Mack, on the RPA claim, this Court explained that the timing of competition and the nature of the market are critical factors to consider when determining whether the plaintiff can show that it was a competing purchaser of a favored purchaser. We concluded that because the competition between Mack dealers occurred during the bidding process, and not at the time of the actual sale, Toledo could not satisfy the competing purchaser requirement or the two purchaser requirement:

> Because no sale takes place until a customer accepts a dealer's bid, the amount of sales assistance Mack is willing to provide to a particular dealer is part of an offer by Mack to sell, not a sale. Regardless of any competition between the dealers during the bidding process, only a dealer whose bid is accepted by a customer will actually buy a truck from

> Mack. Therefore, only one sale, not two, actually results.

*Id.* at 228.

Toledo, unlike the plaintiff in *Volvo Trucks,* did not offer evidence of head-to-head competition between it and other Mack dealers. *Id.* at 215. But it did provide expert testimony regarding "the average amounts of sales assistance Mack offered to Toledo as compared with the average amount of sales assistance Mack offered to other [Mack] dealers," i.e., evidence showing that Mack consistently favored other dealers as compared to Toledo. *Id.* That evidence was rejected by this Court as irrelevant because even if the "amount of sales assistance Mack offer[ed] to each dealer ... determine[d] whether a customer cho[se] to accept a bid from one Mack dealer or another, Mack does not sell a truck to the dealer until the customer actually selects a dealer's bid." *Id.* at 228. Thus, only one sale, not two, resulted from the competition. *Id.* This was true in part because the sale was divorced from the competition and Toledo could not show that it was a competing purchaser vis-à-vis other Mack dealers. *See id.*

Finally, the *Toledo Mack* Court noted that, like *Volvo Trucks,* "the alleged price discrimination d[id] not implicate the original purpose of the RPA because 'the allegedly favored purchasers [we]re dealers with little resemblance to large independent department stores or chain operations.'" *Id.* at 227 (quoting *Volvo Trucks,* 546 U.S. at 181, 126 S.Ct. 860).

## B.

While this Court's conclusion in *Toledo Mack* undoubtedly turned on the fact that "one sale, not two, actually result[ed]," *Toledo Mack,* 530 F.3d at 228, it was not reached by a simple application of the RPA's two purchaser requirement. It was

reached through the combined effect of the RPA's two purchaser and competitive injury requirements—i.e., the competing purchaser requirement. *Id.; see Falls City Indus.*, 460 U.S. at 435, 103 S.Ct. 1282 (explaining competing purchaser requirement); *Volvo Trucks*, 546 U.S. at 179, 126 S.Ct. 860 (same).

In *Toledo Mack* we held that because the competition among dealers for prospective customer business occurred before the purchase of the truck to be sold to the customer by the winning dealer, the relevant market for the sale to the customer was already limited to one at the time the manufacturer sold the dealer the truck. *See Toledo Mack*, 530 F.3d at 228. Because the relevant market was only one dealer making one purchase from the manufacturer for resale to one customer, the two purchaser requirement could not be satisfied. *See id.* Thus, this Court rejected Toledo's RPA claim for lack of two purchasers, which was based on the lack of a competitive market, i.e. the lack of a competing purchaser. *See id.* This conclusion comports with *M.C. Mfg.*, 517 F.2d at 1065, the decision relied upon by this Court in *Toledo Mack*, 530 F.3d at 228, and in this Court's prior decision in this case, *Feesers, Inc.*, 498 F.3d at 214 (instructing the District Court to apply the Fifth Circuit's test to "determine whether Sodex[o] and Feesers compete to resell food products to the same group of customers") (citing *M.C. Mfg. Co.*, 517 F.2d at 1068 n. 20). In addition, the Supreme Court's reasoning in *Volvo Trucks* further confirms our understanding of the competing purchaser requirement.

In *M.C. Mfg.*, two companies, Universal and H/R, manufactured lifting plugs for sales to the government. *M.C. Mfg.*, 517 F.2d at 1061. Both companies purchased "unfinished plug castings" from Texas Foundries and those castings were used to create the lifting plugs. *Id.* Both companies would purchase castings after they had won a contract with the government. *Id.* at 1067. In its complaint, Universal alleged that H/R and Texas Foundries violated the RPA because (1) Texas Foundries quoted a lower price to H/R than Universal for their respective bids for a government contract and H/R won that contract (the "1971 Contract"), *id.* at 1061–62, 1066–67, and (2) Texas Foundries sold unfinished plug castings to Universal at a higher price in a separate contract (the "1970 Contract Extension"). *Id.* at 1065–66. Universal argued that the prices it received in the 1970 Contract Extension were unlawfully discriminatory as compared to the prices H/R received in the 1971 Contract. In doing so, Universal's allegations appeared to satisfy the two purchaser requirement because the two companies were both purchasing the same type of unfinished plug casting from Texas Foundries. This appearance, however, was misleading because the contracts from which Universal's purported injuries flowed were distinct markets open only to a single producer. *See id.* at 1067. H/R and Universal were not competing purchasers because the 1970 Contract Extension and the 1971 Contract each "represented a separate, distinct market open only to a single producer." *Id.* "The very nature of th[o]se mutually exclusive commitments in the respective contracts meant that Universal and H/R could not have been 'in competition' with respect to their separate purchases from Texas Foundries pursuant to the government contracts." *Id.* "Therefore, while the price discrepancy between [Texas Foundries's sales to H/R under the 1971 Contract and to Universal under the 1970 Contract Extension] could have affected Universal's profits under the [1970 Contract Extension], this discrimination in no way diminished Universal's competitive ability in

that plug market." *Id.* Thus, even though "Universal and H/R were competitive bidders on the 1971 [C]ontract[, t]hey could not be ... competitive purchasers as required by the Act either under their respective separate contracts or under both." *Id.*[15]

Similar reasoning was also invoked in *Volvo Trucks,* 546 U.S. at 178, 126 S.Ct. 860. There, the Supreme Court discounted the purchase-to-purchase and offer-to-purchase evidence offered by Reeder in part because that evidence did not show that Reeder competed "with beneficiaries of the alleged discrimination *for the same customer.*" *Id.* (emphasis in original). "That Volvo dealers may bid for sales in the same geographic area" was of no import to the Supreme Court because that fact was not relevant to whether two dealers "compet[ed] for the same customer-tailored sales." *Id.* at 179, 126 S.Ct. 860. "Once a retail customer has chosen the particular dealers from which it will solicit bids, 'the relevant market becomes limited to the needs and demands of a particular end user, with only a handful of dealers competing for the ultimate sale.'" *Id.* (quoting *Reeder–Simco GMC, Inc.,* 374 F.3d at 719 (Hansen, J., dissenting)).

Accordingly, we reject the argument that *Toledo Mack* was a simple application of the two purchaser requirement. Implicit in the *Toledo Mack* Court's holding was the conclusion that Toledo could not show it was a competing purchaser of other Mack truck dealers. In other words, the two purchaser requirement could not be satisfied because the relevant market of competition was limited to one dealer, one customer, and one truck manufacturer at

the time of the sale of the truck, i.e., there were no competing purchasers. *Toledo Mack,* 530 F.3d at 228.

### C.

Applying the teachings of *Volvo Trucks* and *Toledo Mack* to the instant case, it is clear that Feesers never experienced a competitive injury from Sodexo's purchases and sales of Michaels's products because Feesers and Sodexo were not competing purchasers. *See Volvo Trucks,* 546 U.S. at 179, 126 S.Ct. 860. The competition between Feesers and Sodexo for institutions' business occurred *prior* to Michaels's sales of food products to Feesers and Sodexo, "when a customer consider[ed] switching from self-op to food service management, or vice versa." *Feesers, Inc.,* 632 F.Supp.2d at 430. At that time, Sodexo would not yet have secured any products from Michaels for resale to the prospective customer because the customer would only be deciding whether it wished to begin the RFP process or, if it had already chosen to engage in the RFP process, whether to invite Sodexo to participate in that process. Once the customer has chosen whether to self-operate or contract with a food service management company, "the relevant market becomes limited to the needs and demands of a particular end user, with only a handful of [distributors or food service management companies] competing for the ultimate sale." *Volvo Trucks,* 546 U.S. at 179, 126 S.Ct. 860; *Toledo Mack,* 530 F.3d at 228. Thus, Feesers and Sodexo's competition at that early stage was irrelevant to the sales made by Michaels after that competition was complete. If an institution chose to

---

**15.** *See M.C. Mfg.,* 517 F.2d at 1066 ("Even if the sales at different prices are contemporaneous, involve goods of like grade and quality, the price distinction is not justified by good business cause, and it causes injury to the disadvantage[d] purchaser, recovery under the Act is precluded absent proof that the price variance detrimentally affected competition.").

self-operate, Sodexo would be eliminated from the competition, and if an institution chose to contract with a food service management company, Feesers would be eliminated from the competition. After making that initial decision, the customer then has to choose which distributor or food service management company it will hire. Only after that process is complete would the customer then actually purchase food from Michaels through the winning distributor or food service management company.

At all events, assuming Feesers and Sodexo engaged in head-to-head competition, and the discounts granted by Michaels to the two companies determined from which company an institution would purchase Michaels's products, the competing purchaser requirement would still not be satisfied because Michaels does not make a sale until the institution chooses a particular distributor or food service management company and then begins purchasing Michaels's products through that company. *See Toledo Mack*, 530 F.3d at 228. The relevant market at the time of the sale of Michaels's products will have already been narrowed to one—the company that won the institution's business. *See id.*

■ While the timing of the competition and the nature of the market compel us to conclude that Feesers and Sodexo were not competing purchasers, it is also relevant that the evidence produced by Feesers was the same type of average discount evidence produced in *Toledo Mack*.[16] Compare *Toledo Mack*, 530 F.3d at 215 (plain-tiff producing evidence comparing "the average amount of sales assistance" received by the plaintiff as compared to other Mack truck dealers), *with Feesers, Inc.*, 632 F.Supp.2d at 434 (plaintiff producing evidence showing that Sodexo consistently received "stunning" price discounts that amounted to a 59% difference in prices between Feesers and Sodexo over four years). The *Toledo Mack* Court rejected such evidence as insufficient to prove injury to competition in part because "merely offering lower prices to a customer does not give rise to a price discrimination claim." *Toledo Mack*, 530 F.3d at 227–28 (citing *Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.*, 159 F.3d 129, 142 (3d Cir.1998)). A plaintiff must also show that the effect of the lower prices was to injure competition. *Toledo Mack*, 530 F.3d at 228 (citing *Crossroads Cogeneration Corp.*, 159 F.3d at 142); *Volvo Trucks*, 546 U.S. at 181, 126 S.Ct. 860. Yet that showing is impossible where, as here, the case involves sales via a bidding process and the competition occurs before the bidding process even begins. *See Toledo Mack*, 530 F.3d at 228.

In addition, the Supreme Court's directive to narrowly construe the RPA to address the basic purposes of the statute further informs our conclusion that Feesers was not a competing purchaser of Sodexo. *Volvo Trucks*, 546 U.S. at 180–81, 126 S.Ct. 860; *see Toledo Mack*, 530 F.3d at 227. The price discrimination identified by Feesers bears "little resemblance to

---

**16.** The discount schemes in *Volvo Trucks* and *Toledo Mack* were largely indistinguishable from the deviated pricing system used in the food manufacturer industry. *See Toledo Mack*, 530 F.3d at 209–10 (explaining that requests for sales assistance to Mack occurred prior to submission of bid to customer); *Volvo Trucks*, 546 U.S. at 170–71, 126 S.Ct. 860 (same). Food service management companies, self-ops, and GPOs, like the truck deal-ers in *Toledo Mack* and *Volvo Trucks* dealing with manufacturers, availed themselves of deviated pricing arrangements with food manufacturers. In general, these entities know the discount they will receive before they purchase products from manufacturers. Food service management companies can adjust their bid to a prospective customer to incorporate these deviated pricing arrangements.

[the] large independent department stores and chain operations" the statute was originally intended to target. *Toledo Mack,* 530 F.3d at 227 (quoting *Volvo Trucks,* 546 U.S. at 181, 126 S.Ct. 860). Here, like in *Volvo Trucks,* there is a myriad of differences between retail stores and food service management companies and food distributors.

First, in many respects, Sodexo and Feesers do not compete. Sodexo prepares and sells meals and handles all dining service functions for its customers. Feesers only distributes food. Competing retail stores, in contrast, generally compete to sell fungible goods to the same group of customers. Second, Sodexo operates in a bid market with other food service management companies, and competes with Feesers only in a preliminary stage where a prospective customer is deciding whether to self-operate or hire a food service management company. Retail stores compete over prospective customers every time a customer decides to purchase a product, and those purchases are not made in a bid market. Third, Sodexo competes for customers with Feesers prior to purchasing food from Michaels. Retail stores generally purchase products from manufacturers and then compete with other retailers based on pricing.

In sum, because any competition between Feesers and Sodexo occurred at the time an institution was deciding whether to self-operate or hire a food service management company, and any resulting sale of Michaels's products would have to occur after that competition, Feesers cannot show that it was a competing purchaser of Sodexo. The evidence produced by Feesers only further confirms the futility of its RPA claims, because such evidence—evidence showing consistent favoring of another purchaser over the plaintiff over time by a manufacturer in a bid market—

was rejected in *Toledo Mack.* Such evidence cannot support an inference of competitive injury in a bid market. Finally, the Supreme Court's instructions to narrowly construe the RPA also compel us to reject Feesers's RPA claims.

### III.

The District Court, after thoughtful consideration of the *Volvo Trucks* and *Toledo Mack* decisions, determined that those decisions were not controlling for three reasons: (1) *Volvo Trucks* involved only formal competition whereas the instant case involves formal and informal competition; (2) application of *Toledo Mack* to the instant case would misconstrue that decision's holding by imposing a new requirement under the RPA, divorced from the statutory text, that the manufacturer's sale of the commodity to two different sellers occur prior to the competition for the resale of those goods; and (3) a logical reading of *Toledo Mack* limits that decision's applicability to custom-manufactured goods. We reject each of these reasons in turn.

The District Court reasoned that because "[f]ood service management companies, distributors, and GPOs all compete formally and informally for the sale of food to institutions," the instant case was distinguishable from *Volvo Trucks,* which it believed involved only a formal bidding process. *Feesers, Inc.,* 632 F.Supp.2d at 431. Contrary to the District Court's belief, the market in *Volvo Trucks* involved both formal and informal competition. In that case, a customer's decision to request a bid from a particular dealer was based on informal competitive factors such as "an *existing relationship, ... reputation,* and *cold calling or other marketing strategies initiated by individual dealers." Volvo Trucks,* 546 U.S. at 170, 126 S.Ct. 860 (internal quotation omitted) (emphasis

added). Sodexo's actions were indistinguishable from the actions of truck dealers in *Volvo Trucks*. Sodexo competed for institutions' business through the formal RFP process, and through "informal contacts with targeted institutions." *Feesers, Inc.*, 632 F.Supp.2d at 428.

■ The District Court's second reason, that construing *Toledo Mack* to apply to the instant case would require imposing a new requirement under the RPA that the sale of the commodity by the manufacturer to two different sellers occur prior to the competition for resale of those goods, is a misunderstanding of the competing purchaser requirement.[17] The rule the District Court describes is not new—it is simply the product of the competing purchaser requirement, which considers the relevant market, a bid market, and the timing of the competition, before the sale to the manufacturer. The *M.C. Mfg.* Court explained that there is a "competitive purchaser" requirement inherent in the "two purchaser" and "competitive injury" elements. *M.C. Mfg.*, 517 F.2d at 1067; *see Volvo Trucks*, 546 U.S. at 179, 126 S.Ct. 860; *Toledo Mack*, 530 F.3d at 228. In Feesers's prior appeal, we embraced that approach to the competing

purchaser requirement by stating that Sodexo and Feesers compete only if "they are each directly after the same dollar." *Feesers, Inc.*, 498 F.3d at 214 (quoting *M.C. Mfg.*, 517 F.2d at 1068 n. 20). We now hold that, simply put, Feesers and Sodexo cannot compete for the same dollar because their resales of Michaels's products to institutions, by their "very nature[, were] mutually exclusive commitments." *M.C. Mfg.*, 517 F.2d at 1067.[18] The RPA does not ordinarily protect competition where "a product subject to special order is sold through a customer-specific bidding process." *Volvo Trucks*, 546 U.S. at 170, 126 S.Ct. 860 (contrasting such competition with "competition between different purchasers for resale of [a] purchased product"). In other words, the RPA was not meant to cover the type of competition present in the instant case.

Third, the District Court reasoned that a logical reading of *Toledo Mack* limited that decision's applicability to custom-manufactured goods. This conclusion is refuted by the *Toledo Mack* Court's reliance on the *M.C. Mfg.* decision, *Toledo Mack*, 530 F.3d at 228 (citing *M.C. Mfg.*, 517 F.2d at 1065 (manufacturing generic product)), and this Court's explicit guidance to apply the

---

**17.** That being said, the District Court's desire to avoid misapplying our precedent in this complicated area of law is commendable. Indeed, this is not the first time the RPA has flummoxed the federal courts, nor, barring a repeal of the law, will it be the last. *Compare, e.g., Van Dyk Research Corp. v. Xerox Corp.*, 631 F.2d 251, 255 n. 2 (3d Cir.1980) (asserting in dicta that failure to prove the "fact of injury" can conclusively bar injunctive relief) (citing *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 668 n. 2, 670 n. 14 (D.C.Cir. 1977)), *with Feesers, Inc.*, 498 F.3d at 213 (explaining that plaintiff need not prove actual harm to competition to receive injunctive relief) (citing *Falls City Indus.*, 460 U.S. at 435, 103 S.Ct. 1282). The RPA places the federal courts in an inescapable Catch–22. We are asked to apply the RPA, a statute that

"is fundamentally inconsistent with the antitrust laws," Antitrust Modernization Commission, Report and Recommendations 312 (2007), in a fashion that is "consistent[] with the broader policies of the antitrust laws." *Volvo Trucks*, 546 U.S. at 181, 126 S.Ct. 860 (quoting *Brooke Group*, 509 U.S. at 220, 113 S.Ct. 2578). This conundrum is bound to create confusion for judges called upon to apply the RPA in a host of settings.

**18.** Notably, we do not hold that the sales of products by the manufacturer to two purchasers must always occur prior to the competition between the two purchasers. Our holding is limited to bid markets that closely resemble the markets in this case, *Volvo Trucks*, and *Toledo Mack*.

principles of *M.C. Mfg.* to this action. *Feesers,* 498 F.3d at 214 (citing *M.C. Mfg.,* 517 F.2d at 1068 n. 20). Moreover, there is no reason to limit the reach of the *Toledo Mack* decision to customized goods because the underlying principles, pertaining to the timing of the competition and the nature of the market, remain the same whether applied to generic goods or customized goods. This Court's directive to "narrowly interpret the oft-questioned RPA" also supports rejection of the District Court's view. *Toledo Mack,* 530 F.3d at 228 n. 17. A narrow interpretation, one that limits the applicability of the Act, calls for taking an expansive view of *Toledo Mack*'s holding and not limiting it to customized goods. *See id.* Finally, even if the *Toledo Mack* decision was limited to customized goods, Sodexo offers Michaels's food products as part of a customized service to customers. *Feesers, Inc.,* 632 F.Supp.2d at 428 (finding that Sodexo sometimes "determines whether there are any particular problems to be solved [at an institution]").[19] Presumably, problems vary across institutions so the proposed solutions for any given institution would be tailored to that institution's needs. In fact, the mere existence of a formal RFP process shows that institutions require customized contracts to serve their specific needs.

### IV.

Having determined that Feesers and Sodexo were not competitors, three outstanding issues remain. First, whether this Court's holding is barred by the law of the case. Second, how this Court's holding will affect the existing permanent injunction ordered by the District Court. Third, the effect of concluding that Feesers cannot prove a § 2(a) claim against Michaels on the § 2(f) claim against Sodexo. We discuss each of the issues in turn.

### A.

 The "law of the case . . . doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). The "doctrine does not restrict a court's power but rather governs its exercise of discretion." *Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron,* 123 F.3d 111, 116 (3d Cir.1997) (citations omitted). "A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would make a manifest injustice." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (citing *Arizona,* 460 U.S. at 618 n. 8, 103 S.Ct. 1382).

---

**19.** For example, in a proposal to the Beth Sholom House of Eastern Virginia, Sodexo urged the institution to utilize its food procurement program to "take full advantage of [Sodexo's] kosher vendors." *Feesers, Inc.,* 632 F.Supp.2d at 429. The proposal states that using Sodexo's kosher vendors would "streamline the ordering process [and] substantially reduce pricing" for the institution. *Id.* Kosher food purchasing is an institution-specific requirement and thus is a customized offering. The same would be true for hospitals, which utilize lengthy RFP processes to confirm that all the special needs of the hospital are met by the food service management company. In fact, the foods ordered for any particular institution would depend on the "size and type of institution" and may include "bids on a wide range of services." *Id.* at 428. Sodexo also enters into profit and loss contracts where "[it] offers a financial guarantee that the dining services will not lose money, and the institution shares in a certain percentage of the profits." *Id.* at 442.

Feesers argues that this Court held, in its prior opinion, that the evidence of price discrimination in the record was sufficient to apply an inference of competitive injury. If this argument were true, it would be difficult for us now to conclude that Feesers cannot show that it was a competing purchaser, as being a competing purchaser is a prerequisite to the application of the inference. Feesers's argument, however, fails for several reasons.

First, this Court's prior opinion did not hold as Feesers now claims. This Court reversed the District Court's summary judgment for the defendants explaining that the District Court used the wrong standard in concluding that Feesers and Sodexo were not in actual competition. *Feesers, Inc.*, 498 F.3d at 208. In doing so, we noted that "*if* substantial price discrimination between competing purchasers over time is established, *then* the inference of competitive injury arises." *Id.* at 216 (emphasis added). At that early stage of the litigation, this Court believed only that "Feesers ha[d] proffered sufficient evidence of competition between itself and Sodex[o] . . . to allow a reasonable factfinder to conclude that [they] [we]re in actual competition." *Id.* (internal quotation omitted). This Court then remanded the case for further proceedings consistent with its opinion. *Id.* at 216. Nowhere in the prior opinion did this Court hold that Feesers and Sodexo were competing purchasers or, more generally, that Feesers had established an inference of competitive injury. Thus, the law of the case does not prevent us from holding that Feesers and Sodexo were not competing purchasers under the RPA.

Second, our present review of this case is conducted with the benefit of a full record established at trial. That record was not available to this Court when we decided Feesers's appeal from summary judgment. We now know that Feesers cannot show that it and Sodexo were competing purchasers based on the timing of their competition and the nature of the market—issues that were never discussed in the prior opinion, presumably, because a complete record had not been established. Finally, even if this Court had previously held otherwise, our holding in this case would be a permissible reevaluation of precedent in light of intervening authority, *Toledo Mack*. See *Institutional Investors Group v. Avaya*, 564 F.3d 242, 276 n. 50 (3d Cir.2009) (citing *Reich v. D.M. Sabia Co.*, 90 F.3d 854, 858 (3d Cir.1996)).

### B.

■ The permanent injunction issued by the District Court states: "[Michaels] is enjoined from refusing to sell its products to Feesers on the same terms as they are sold to Sode[x]o, so long as Feesers otherwise meets its standards as a customer." This injunction was issued under Section 16 of the Clayton Act (1) as a remedy for contempt and (2) to prevent future competitive injury to Feesers. Because we are reversing the District Court's judgment as a matter of law, neither of its reasons for the injunction survive. An injunction issued based on civil contempt cannot stand where the underlying order on which it is based is invalid. *See Universal Athletic Sales Co. v. Salkeld*, 511 F.2d 904, 909–10 (3d Cir.1975). Our holding today renders the need to protect Feesers from further injury non-existent, because Feesers, as a matter of law, is not a competing purchaser vis-à-vis Sodexo.

### C.

Feesers's claim against Sodexo arises under § 2(f) of the RPA. That provision states: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or

receive a discrimination in price which is prohibited by this section." 15 U.S.C. § 13(f). Because a prima facie case of price discrimination under § 2(a) of the RPA cannot be established against Michaels, Sodexo cannot be held liable for inducement. *Great Atl. & Pac. Tea Co.*, 440 U.S. at 76, 99 S.Ct. 925 ("[A] buyer cannot be liable if a prima facie case could not be established against a seller.").

## V.

Feesers cannot show that it and Sodexo were competing purchasers, and therefore, cannot show that it suffered competitive injury under the Robinson–Patman Act. Accordingly, we will reverse the District Court's judgment for Feesers and instruct the District Court to enter judgment as a matter of law for Michaels and Sodexo.